THE PEOPLE *ex rel.* Charles S. Deneen, State's Attorney,

*v.*

CHARLES A. SHIRLEY.

*Opinion filed February 21, 1905.*

DISBARMENT—*false representation to clients is ground for disbarment.* The relation of an attorney to his client being one requiring the utmost good faith and fair dealing, proof that an attorney obtained money from his clients by falsely representing that certain conditions existed calling for his services and for money for fees and court costs is ground for disbarment.

INFORMATION for disbarment.

CHARLES S. DENEEN, State's Attorney, (D. S. GEER, and JOHN L. FOGLE, of counsel,) for relator.

E. R. ELDRIDGE, and EDWARD P. VAIL, for respondent.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Leave for that purpose having been granted, Charles S. Deneen, State's attorney of Cook county, filed in this court an information, at the instance of a committee of the Chicago Bar Association, against the respondent, Charles A. Shirley, charging him with unprofessional conduct and praying that his name may be stricken from the roll of attorneys of this court. The information having been answered, the issues of fact were referred to a commissioner to take and report the evidence. In pursuance of that reference the evidence has been taken and returned and the cause has been argued by the respective parties and submitted for decision.

One charge of the information is, that in October, 1899, Emily A. Knapp, being the owner of an undivided three-fourths of real estate leased to Thomas S. Kirkwood for a term of twenty-five years ending December 1, 1910, with a provision that at the end of the term the lessor should buy

any building or buildings on the property, called on respondent in reference to a controversy concerning the termination of the lease and the purchase of the buildings; that respondent then advised her that it was necessary to procure insurance policies on the buildings and the cost of the same would be $108, which amount she paid to him on October 12, 1899; that shortly afterward respondent represented to her that a suit concerning her interest was pending in one of the courts, and demanded $125, representing that $100 was necessary for court costs and $25 for his fee; that relying upon the information so given to her she gave him said sum of $125; that afterward respondent informed her that the suit had come to a close and resulted favorably to her and that it would be necessary to record the deeds of the property, the cost of which would be $50, which she paid him on January 9, 1900. The information further alleges that during the pendency of the supposed litigation respondent borrowed $500 from Mrs. Knapp and gave her his note due in six months, and gave her as collateral security an over-due note dated March 16, 1893, secured by a trust deed; that there was a controversy about the legality of the collateral note; that respondent never re-paid the money loaned to him, and when called upon by other attorneys in reference to said payments to him, amounting to $283 for insurance, court costs and fees, he refunded $255 but paid no part of the loan. The information avers that there was no necessity for insurance or the payment of insurance fees, and none were paid; that there was no suit pending and no costs of court or for recording deeds to be paid, and that each representation of respondent with respect thereto was false and fraudulent.

The answer admits that in the month of October, 1899, Mrs. Knapp consulted the respondent with reference to the pending controversy concerning the lease mentioned in the information; that he counseled her that it was advisable to insure her interest in the buildings and have the premises surveyed, and that he received said sum of $108, which was

a rough estimate of the cost of insurance and surveying the property for the purpose of protecting her interests. The answer also admits that respondent received $125, as alleged in the information, but denies that he ever represented any suit was pending in any court, and says that he received the money as his just fees in a chancery suit then contemplated by him for the purpose of settling and establishing Mrs. Knapp's rights. The answer denies that respondent informed Mrs. Knapp that it would be necessary to record deeds, the cost of which would be $50, but admits that he received $50 January 9, 1900, which he says was for services performed in her interest. He admits that he borrowed the sum of $500 from Mrs. Knapp and gave her his promissory note, with the note and trust deed as collateral security, but denies that the security was bad, and says that after the maturity of the note Mrs. Knapp sued him on the same and obtained judgment, which was satisfied.

The above charges contained in the information are supported by the testimony of Mrs. Knapp and her son, and there is no material contradiction between the parties as to the first transaction. The conservator of Mrs. Knapp's father had leased a tract of land to Kirkwood, and she was entitled to three-fourths of the land under her father's will. She and her son went to the respondent and told him that Kirkwood had said that he was intending to terminate the lease and they would have to buy the buildings. Respondent went to the recorder's office and examined the record of the lease and examined the will, and told her that it was advisable to procure insurance on the buildings, and that it would cost $108. She paid him the money and received a receipt for it not specifying for what purpose it was received. The lease provided that the lessee should keep the buildings insured, and respondent did not know whether they were insured or not, and did not obtain any insurance or do anything affecting the property itself except to have another person make a survey and estimate of the cost and value of the im-

provements and the income. There was no necessity for the payment of money for insurance premiums, but respondent kept the money until the last of May, 1900, when he was called upon to refund it.

Respondent advised with Mrs. Knapp from time to time about the property and lease, and she and her son testified that he represented to her that he had to go to court to see about her lots; that he had a notice from Kirkwood's lawyer about it, and that he wanted $125, of which $100 was to use in the court matters and $25 on account of his fees, and the money was paid to him. Respondent called on the Chicago agent of Kirkwood, but there was never any attempt to terminate the lease or have Mrs. Knapp take the buildings, and there was never any suit or proceeding in court to which she was a party or with respect to the property. Respondent testified that he investigated the condition of affairs and advised Mrs. Knapp as to her interests and that the $125 was for his fees, but denied that he represented there was any suit in court. The $50 was paid on January 9, 1900, by Mrs. Knapp in response to a letter delivered to her by respondent's brother, saying that in her case it would be necessary to complete a record which would require the expenditure of $50, and requesting her to pay that amount to the brother. She paid the money to the respondent and took his receipt for it. The representation of the letter was false and it was sent to Mrs. Knapp by the respondent, but he testified that he told Mr. Stein, an assistant in his office, to write Mrs. Knapp that he wanted $50 to use in expenses, and that the letter was written by Stein. He claimed that he called for the $50 to reimburse himself for what he had paid out, a part of which was for the survey of the property. The contradiction between Mrs. Knapp and her son on one side and respondent on the other is concerning the representations upon which the sums of money were obtained.

During the time that respondent was acting as attorney for Mrs. Knapp he borrowed $500 from her, giving her his

214—10

note and a collateral note secured by a trust deed, as alleged in the information. There was a controversy about the validity of the collateral note, which appears not to have been settled, and after the maturity of respondent's note she sued him and obtained judgment for the full amount, with interest, which she assigned to one Hiller for $280. She also employed attorneys to recover the other sums of money paid to the respondent, and he paid back $265 in three payments.

Another charge of the information is, that respondent, when called upon by Robert Vogelsang to assist him in perfecting the title of real estate purchased from Julia Schmidt, recommended that he should swear out a warrant for the arrest of Fred Schmidt, her husband, for obtaining money under false pretenses, and obtained money from Vogelsang for that purpose; that respondent afterward notified Vogelsang that a warrant had been sworn out before Justice Hotaling, a justice of the peace of Cook county, and Schmidt had been arrested and had given a bond signed by Thomas Miller as surety; that afterward respondent told Vogelsang that Schmidt had defaulted and forfeited his bond, and it was necessary to bring suit on the bond and get out a writ for the arrest of the surety; that respondent demanded an additional sum of money on that account, which was then paid; that during the next six months respondent informed Vogelsang from time to time that the suit for forfeiture of the bond was pending in the criminal court, and that it was necessary to advance certain costs from time to time; that Vogelsang paid the respondent, as such costs, various amounts, ranging from $5 to $15, on three or four different occasions; that on one occasion, in May, 1900, respondent presented to Vogelsang a pretended notice of Henry Ruger, attorney for defendant Schmidt, that he would appear in the superior court before Judge Waterman and move for a rule on the plaintiff to complete plea and for $10 to be paid, and that by means thereof he obtained said sum of money; that at one time respondent informed Vogelsang that it was necessary to file

a complaint in the criminal court and the State's attorney
would then proceed to collect the amount Vogelsang had
paid for the property; that respondent drew up a document
which he stated he would file in the criminal court, and de-
manded $25, which was paid to him; that at one time re-
spondent took Vogelsang before John R. McDonald, who
had an office on LaSalle street, in the city of Chicago, but
who lived at Gary, about thirty miles from Chicago, and
thereupon a paper of some kind was executed by Vogelsang,
and he was advised that the costs would be $10, which he
paid to the respondent. The information charged that there
was never any suit before Hotaling in the name of the Peo-
ple against Fred Smith or Schmidt; that there never was
any case in the criminal court so entitled; that no proceed-
ing of any kind was ever instituted for Vogelsang, and that
all respondent's representations, and the notice and petition,
were false and fraudulent and exhibited solely for the pur-
pose of obtaining money from Vogelsang for pretended liti-
gation which did not exist. The answer denies each and
every allegation of the information as to dealings with Rob-
ert Vogelsang.

Vogelsang had bought four lots in Will county from
Julia Schmidt, but did not put his deed on record at once,
and the lots were afterward conveyed to another party, who
recorded his deed first. Vogelsang went to the respondent,
who examined his abstract and agreed to attend to the mat-
ter for him. In his testimony respondent admitted the receipt
of different sums of money from Vogelsang at different
times, amounting to $85, and there were some additional
sums paid by Vogelsang to a man who was about respond-
ent's office and got the money, alleging that it was for him.
The respondent testified that he proposed to file a bill in the
circuit court of Will county to establish Vogelsang's title,
and prepared such a bill; that Vogelsang paid him at that
time $30 but that nothing was ever done with the bill. He
said that he charged collusion in the bill, and, of course, if

a suit was to be commenced to impeach the second deed it was important that it should be done at once, before the rights of other innocent parties had intervened. Respondent testified that he saw Schmidt and the other parties and was trying to get the matter adjusted. Vogelsang testified that respondent took him to the criminal court building, on the north side, where respondent made out papers to bring the matter in court; that respondent told him at one time that he had a warrant sworn out before Justice Hotaling for Schmidt and Thomas Miller went on Schmidt's bond and was good for the money; that the respondent told him that Schmidt did not show up and had moved away and he could not find him, and that respondent would go after Miller and see that he got the money out of Miller. There was a notice such as was charged in the information, purporting to be signed by Henry Ruger, an attorney, but there was no such attorney in Chicago. There never was any suit or proceeding before Justice Hotaling or in the criminal court relating to the matter in any way, and respondent denied that he made any representation to that effect, and claimed that the moneys paid him were for his fees and services. As to the proceeding before McDonald there was no contradiction in the testimony. In May, 1900, respondent advised Vogelsang to swear out a warrant for the arrest of Fred Schmidt, husband of Julia Schmidt, saying that in that event Schmidt would be more anxious to settle and urge other people who had the power to settle. McDonald had an office in Chicago to receive business, but had his court and heard his cases at Gary station, in a remote part of Cook county. Respondent took Vogelsang to the Chicago office and the warrant was sworn out and Vogelsang paid the justice $5, which respondent knew was in excess of any legal charge which the justice could make. The warrant was never served or heard from again and respondent paid no attention to it. Vogelsang testified that during all the time the matter was pending he called on the respondent every two or three weeks and the

payments were made as required by the respondent, some for himself and some for court costs.

An amendment to the information was filed, charging that about the first of January, 1892, the respondent, under the name of Charles Alexander, purchased certain lots and by that name executed a mortgage on them for $400, describing himself as a bachelor when in fact he was a married man, and took his own acknowledgment before himself as a notary public. There is no answer to this charge, and the respondent, when examined, refused to testify concerning it, for what reason is not stated. The full name of the respondent is Charles Alexander Shirley, and he bought the lots, which were conveyed to Charles Alexander. Hubert Barrette loaned $400 on the lots, taking a note and trust deed, which he sold. He testified that a person who was not respondent was in the office with respondent and was represented to be Alexander; that Alexander signed the note and the witness gave the money to respondent, who gave it to Alexander, and that Alexander signed the note and acknowledged the mortgage. The witness never saw Alexander before or afterward. In June, 1894, the note secured by the trust deed was sent to an attorney in Chicago to collect. He went to see respondent, who told him Charles Alexander was a contractor, and gave him the number of his residence, which was a vacant lot, and no Charles Alexander could be found in the directory. The attorney charged respondent with being Charles Alexander, and shortly afterward respondent paid the note. The natural conclusion is, that for some reason the respondent took title to the lot in the name of Charles Alexander and that some one executed the note and trust deed in that name and respondent took the acknowledgment, but no one was injured in any way by the transaction.

In giving leave to file the information we were of the opinion that the charges therein contained, if proved, would necessitate striking from the rolls the name of the respond-

ent, and we are of the opinion that material portions of the charges have been proved. Leaving out of account the borrowing of money by respondent from his client, Mrs. Knapp, which was of questionable propriety, and the transaction of buying and mortgaging property in the name of Charles Alexander in 1892, the evidence supports the charges of false representations to his clients. There was no reason to suppose that insurance or insurance money was required. He did not know whether there was any insurance and made no effort to ascertain whether there was or not, and he never applied for or obtained any. If he took the money for insurance under any misapprehension, he ought to have promptly returned it instead of giving it up only on the demand of other attorneys long afterward. The only service rendered by respondent was the examination of the lease and will and some other trifling services. Nothing was ever done towards terminating the lease or compelling Mrs. Knapp to take the buildings, and it does not seem likely that she would have paid the sums of money that she did for such services, and without the representations which she and her son testified to, that there was some sort of proceeding in court requiring the services and the payment of costs. The warrant which respondent had Vogelsang swear out in Chicago, returnable at Gary, was never served and there was no attempt to serve it. If a bill was drawn by respondent, the inference from the evidence is that there was no intention on his part of ever filing it or beginning a suit. He was obtaining money from Vogelsang frequently, while, by his own testimony, he was doing nothing of any consequence for him. Further comment does not seem necessary, but, considering all the evidence and the nature of the transactions in which respondent was concerned, we think the conclusion unavoidable that he should not hold a license from this court to practice the profession of law. The relation of an attorney to his client is one requiring the utmost good faith and fair dealing, and the license to practice is a guarantee that so far as this court is

advised the attorney holding it is a fit and proper person to manage the legal business of others.

Being of the opinion in this case that the material averments of the information have been proved, the rule will be made absolute and respondent's name will be stricken from the rolls.               *Rule made absolute.*