IN THE MATTER OF VERNE LACY.—112 S. W. (2d) 594.

St. Louis Court of Appeals.   Opinion filed Nov. 26, 1937.

*Jos. H. Grand* and *James Garstang* for informants.

*Sigmund M. Bass* for respondent.

*Verne R. C. Lacy per se.*

SPRADLING, C.—This is an original proceeding in this court. It was instituted on the 2nd of November, 1936, by the Bar Committee of the Eighth Judicial Circuit for the purpose of disbarring or disciplining Verne R. C. Lacy; that on the 4th day of November, 1936, Verne R. C. Lacy entered his appearance in said cause, and waived the issuance and service of a citation; that on the 29th day of December, 1936, A. M. Spradling, a member of the Cape Girardeau County Bar, was appointed Special Commissioner to take the evidence, pass on both the law and the facts, and report his conclusions to this court; that on the 31st day of December, 1936, A. M. Spradling, duly qualified as Special Commissioner, and that, thereafter, he heard the evidence in said cause, and took the case under advisement, and now, having fully considered all the evidence in the case, and the briefs of the respective parties, reports herewith his findings of fact and conclusion of law in said cause.

The information in this cause charges and the proof shows:

That Samuel H. Lieberman, Grover C. Sibley, George M. Hagee, and Jesse McDonald are now, and were, at all times hereinmentioned, duly licensed and practicing attorneys at law within and for the State of Missouri, and are the duly appointed, qualified, and acting members of the Bar Committee of the Eight Judicial Circuit, and are hereafter referred to as "Informants." That respondent is, and was, at all the times herein mentioned, a duly licensed and practicing attorney in the City of St. Louis and State of Missouri. That subsequent to their appointment and qualification, the informants conducted informal investigations of the alleged professional misconduct of the respondent in the practice of his profession in St. Louis, Missouri, and, upon due notice to the respondent, held formal hearings in the city, and, thereafter, found the respondent guilty of professional misconduct, and guilty of acts showing him to be unfit to practice law. An information was then filed in this court charging respondent with unprofessioal conduct and such charges may be summarized as follows:

**1.**

That respondent, while acting as attorney for one John Lolordo, administrator of the estate of Vincenzo Lolordo, caused himself to be appointed successor trustee under certain deeds of trust on real estate in St. Louis, Missouri; that the said real estate belonged to the estate of Vincenzo Lolordo; that respondent, as trustee, sold the real estate, obtained the proceeds of the sale, and, after paying certain proper and lawful charges therefrom, wrongfully and improperly commingled said moneys with his own, and converted the same to his own use; that he retained, failed to pay over and to deliver to the estate money in excess of $10,000; and after judgment had been rendered against him in said cause for said amount, he continued to wrongfully withhold and retain the said money.

**2.**

That, respondent, on or about the 16th day of May, 1932, while acting as attorney for one Paul Richards, who had been indicted for kidnaping, offered or caused to be offered money and bribes to one Edward L. Anna, a prospective juror; that after the trial of said cause, the respondent paid or caused to be paid certain sums of money to Edward L. Anna who had served as a juror and voted for the acquittal of Richards.

**3.**

That, on numerous occasions, the respondent secretly and surreptitiously induced and caused one Henry West an employee of the Circuit Court of the City of St. Louis, acting as a messenger for the sheriff of the City of St. Louis in the delivery of lists containing the names of persons summoned for jury service in the Criminal Divisions of the Circuit Court of the City of St. Louis, to allow and permit the accused for a consideration to copy from said list the names thereof; that respondent knew the lists were confidential, and that West, in permitting him to make copies, was violating the duty and obligation he owed the Circuit Clerk and the Sheriff of the City of St. Louis; and that respondent, knowing these facts, corrupted and induced the said Henry West to impart said information to him.

**4.**

That respondent, knowing one Paul Richards had been disbarred from the practice of law in this State, did associate the said Paul Richards with himself in the practice of law in his office, and caused the said Richards to act in the capacity of an attorney at law in various matters in which respondent was attorney.

## Count 1.

In January, 1925, Vincenzo Lolordo died intestate in the City of St. Louis. John Lolordo, his brother, was appointed administrator of the estate, and respondent was selected as his attorney. A claim for $25,000 was presented and allowed John Lolordo against the estate of his brother. There were no personal assets with which to pay the claim. Vincenzo Lolordo owned real estate at 3220 and 3103 Washington Avenue. The real estate was encumbered by deeds of trust. The respondent was appointed successor trustee under the deeds of trust for the purpose of selling the real estate. The property was sold and a controversy arose between John Lolordo, administrator, and respondent, his attorney, relative to the proceeds derived from the sale. The administrator instituted a proceeding in the Probate Court of the City of St. Louis against respondent for the purpose of discovering assets which he claimed respondent wrongfully withheld. The cause was tried in the Circuit Court of the City of St. Louis, resulting in a verdict and judgment for plaintiff. The case was then appealed to the Supreme Court where it was affirmed. The facts and law of the case will be found reported in 88 S. W. (2d) 353.

The bill of exceptions, the abstract of the record, the briefs of both appellant and respondent and the mandate of the Supreme Court, in the above case, were all offered in evidence in this cause.

We have examined these offerings very carefully, and have reached the conclusion that we are unable to make a better and more definite statement of the facts than those made by the author of the opinion in the Supreme Court, and we, therefore, adopt this statement as contained in that opinion, as follows:

John (or Giovanni) Lolordo was, in 1925, appointed administrator by the Probate Court of the City of St. Louis of the estate of his deceased brother Vincenzo Lolordo. Defendant was the attorney for plaintiff as administrator and had also acted as Vincenzo's attorney during his lifetime. The assets of the estate included properties at 3103 and 3220 Washington Avenue. A petition was filed to sell this real estate under an order of the Probate Court, but, because of Vincenzo's widow being in Italy, so that her dower right could not be readily obtained, this was abandoned and the properties were sold under foreclosure of first deeds of trust thereon. While these properties were sold at a foreclosure sale, the amount for which they were to be sold was agreed upon as though they were to be sold at private sale and this price was in excess of their appraised values. Defendant, on applications to the Circuit Court, was appointed successor trustee of both deeds of trust. The property at 3220 Washington was sold to Nellie D. Scott at the foreclosure sale October 27, 1925. The property at 3103 Washington was sold at foreclosure sale on January 14, 1926, to Morris Lipschitz. The first mortages and delinquent taxes were each

time paid out of the agreed sale price, the balance was turned over to defendant, and deposited by him in his own name (or in the name of himself and his stenographer who at least had authority to draw checks on it) in an account in which it was commingled with defendant's own personal funds. Just how much defendant received after the mortages and taxes were paid and how much thereof he had accounted for was the issue tried in this case.

There was no dispute about the fact that the agreed sale price for the property at 3220 Washington was $20,500; and that the trustee's deed stated that it was sold for $19,270. The difference was the taxes due estimated at $1230. Actually it took $1237.87 to pay these taxes and there was another tax item of $14.83. The amount which defendant received as trustee from the sale was $14,770, which figure was reached as follows:

Total sale price ..................................... $20,500.00
Retained to pay taxes .............................. 1,230.00

Consideration stated in trustee's deed ................ $19,270.00
Check to holder of first trust deed .................... 4,500.00

Amount deposited in defendants bank account ........ $14,770.00

Defendant's own testimony was that he paid the excess of taxes and that the amount paid for the first mortgage and accrued interest was $4522. There is also evidence that $13.24 was paid as an insurance adjustment; that $20.50 was paid for revenue stamps on the trustee's deed (Plaintiff claims the purchaser paid these items); that $4 was paid for court costs in obtaining his appointment as trustee; that $74.42 was paid for notice of foreclosure sale; and that $617.50 was paid as a real estate broker's commission (these last three plaintiff does not dispute) for obtaining the buyer at the sale. In addition, defendant was entitled to the statutory trustee's fee of $131.35 (section 3092, R. S. 1929 (Mo. Stat. Ann., sec. 3092, p. 1917)), although nothing was said about this at the trial. These items total $905.71, so that if defendant be given credit for all of them, there remained in his hands $13,864.29 from this sale which belonged to the Lolordo estate.

There is much more dispute about the agreed sale price for the property at 3103 Washington and the disbursements therefrom. The trustee's deed stated that it was sold for $8100. Defendant testified that the taxes were paid out of this amount. Plaintiff had the tesimony of the purchaser that he paid $8100, and all taxes, which he said made the total about $10,000. The real estate man who arranged the sale said the total sale price was $9800, and that this included all taxes. The jury had the right to find that it was at least that much and we must consider on ruling the demurrer that they did so find.

Starting with this figure, the evidence shows payments made from it, as follows:

| | |
|---|---:|
| Total sale price | $9,800.00 |
| Real estate broker's commission | 300.00 |
| | $9,500.00 |
| Retained to pay taxes (actually $1403.23) | 1,400.00 |
| | $8,100.00 |
| Consideration stated in trustee's deed | $8,100.00 |
| Paid to holder of first trust deed | 3,892.40 |
| | $4,207.60 |
| Paid to holder of second trust deed | 600.00 |
| | $3,607.60 |

There is evidence to show that $8.50 was paid for revenue stamps; that $4 was paid for court costs in obtaining appointment as trustee; that $71.06 was paid for notice of foreclosure sale; and defendant was entitled under section 3092, Revised Statutes 1929 (Mo. Stat. Ann., sec. 3092, p. 1917), to a trustee's fee of $75.50. These items total $159.06, so that if defendant be given credit for all of them, there remained in his hands $3,448.54 from this sale which belonged to the Lolordo estate. Defendant claimed credit for another real estate commission of $215, but his authority to pay this was disputed and the jury had the right to reject it. This was also true of the attorney's fee of $500, which defendant claimed he paid to another lawyer for acting as attorney for him as trustee. In the absence of a showing that this was necessary and was authorized by the trust deed, he had no right to do so. [Condict v. Flower, 47 Mo. App. 514; Tracy v. Gravois R. Co., 13 Mo. App. 295, affirmed 84 Mo. 210.] There was also evidence that plaintiff, as administrator, gave defendant $900 for expenses in these matters and that defendant retained $235, giving him back $665. This was sufficient to pay the trustee's fees to which defendant was entitled and some of the other smaller items for which he claims credit.

There was considerable controversy about the total amount of taxes on this property and who paid them, which the evidence does not make entirely clear. Lipschitz, the purchaser, testified:

"What I can get off the books, it was $8100, if I am not mistaken and that was the purchase price, and then we had to pay all taxes, back taxes, street taxes, which went up to nearly $10,000 . . . The way I recollect it, I bought it for $8100, and supposed to pay all these specials that accumulated on it in addition to the $8100. I paid the trustee at auction $8100. . . . I know I paid all taxes and $8100. That is what we paid for it but I am not sure whether I paid it direct or Mr. Shelp. . . . It is clear in my mind that I put up

$9800 for that property; that included the commission. . . . (Referring to memorandum.) The taxes is marked $1,403.23, and that is with the street bill, and $8100 principal, and $300 commission.''

In this he was corroborated by the real estate broker, Mr. Shelp, who testified from memoranda, made at the time, as follows:

''The memorandum I have on the back, is that there was $1400 taxes and street bills, and $8100 purchase price, and $300 commission he gave me, making a total of $9800. This totals $9,803.22, and that is what he deducted, $3.22. I was to get $300, and he gave me $296. I get a little less than he agreed to give. . . . It is a sort of memorandum of the approximate debts that were against this property that was to be foreclosed, that we had looked up at the City Hall and other places, tax bills and street bills. The total we have is $5,370.99. That includes interest in the first deed of trust on the property, and street bill. The selling price was $9800. That memorandum shows the amount to the deed of trust as $3700.''

It does not seem to be possible to make the various figures as to taxes, in these memoranda or in the evidence, come out to one certain amount. In the memorandum showing the total sale price of $9800, the taxes and tax bills were $1,403.22. In the memorandum showing total indebtedness against the property of $5,370.99, it would appear from deducting the amount of first mortgage and interest therefrom ($3,892.40), that the taxes and tax bills were $1,478.59. The testimony of Lipschitz is that he paid $1,660.22 ($1,170.97 and $590.25), which would show his $10,000 total. Defendant claims that they amounted to $1,744.69; that there was another old one of $1,478.88; and that he paid them all out of the $8100. Whatever they were, the dispute is: Who paid them? and, Were they paid in addition to the $8100 consideration stated in the trustee's deed? We hold that this made a question for the jury to settle. It is interesting to note that the items for which defendant claimed credit would take almost every cent of the safe price if it was only $8100. Without including any attorney's fee or trustee's fee, they amount to $8,014.53.

While defendant claimed an allowance for the payment of the old special tax bill on this property of $1,478.88, this tax bill shows on the front thereof an assignment to the West St. Louis Trust Company from the street contractor to whom it was issued, and also the following statement: ''St. Louis, Feb. 9, 1922. Received payment in full of the above amount. West St. Louis Trust Co. Earle Meeks, Sec.'' On the back is also this statement: ''Bill entered satisfied in Vol. 62, page 163. St. Louis, Feb. 27, 1922. Louis Nolte, Comptroller.'' Since Vincenzo Lolordo did not die until 1925, the jury had the right to believe, as plaintiff claimed, that he paid this tax bill during his lifetime.

According to the computation above made, which gives defendant the benefit of some items in dispute, he held $13,864.29 from the first

sale and $3,448.54 from the second which belonged to the Lolordo estate, a total of $17,312.83. Whether he had this amount, or only about $14,000 as he claims, it was his duty to immediately turn it over to the plaintiff as administrator of the estate to which it belonged. Defendant seems to take the view that this controversy is a personal one between himself and John Lolordo; and that, even if he has not shown that he has expended all of the money for the benefit of the estate, his demurrer to the evidence should have been sustained if he showed that an amount equal to the rest of it was expended for the benefit of John Lolordo personally. This overlooks the true nature of this proceeding. Plaintiff's right to a judgment herein is not based upon what he is personally entitled to as his own, but upon what belongs to the estate of Vincenzo Lolordo, for which he is acting in a representative capacity as administrator. Defendant's own testimony shows that the court should have overruled the demurrer to the evidence, because he admitted that he received the proceeds of these two properties and did not turn these proceeds over to the administrator, but put them in his own bank account with his own personal funds and that they were not all used for the benefit of the estate. In this situation, he was not entitled to have the court rule a demurrer to the evidence in his favor because, if there was evidence reasonably tending to show any amount of these proceeds had not been so paid or accounted for, it was the duty of the court to submit the case to the jury to determine what that amount was. What he paid for the administrator personally and not for the estate was at his own risk and must be considered as paid out of his own personal funds and not out of these sale proceeds, which he held as trust funds, because it is a well-established rule that when a trustee has received and commingled trust funds with his own funds, it is presumed, in the absence of a contrary showing, that the trust funds are still there, and it will be considered that what was paid out of the commingled funds for other than trust purposes was paid out of the trustee's personal funds and not out of the trust money, and that all the rest remains as trust funds. [State ex rel. Talbott v. Shain, 334 Mo. 617, 66 S. W. (2d) 826; Orr v. St. Louis Union Trust Co., 291 Mo. 383, 236 S. W. 642; Horigan Realty Co. v. First National Bank, 221 Mo. App. 329, 273 S. W. 772; Bishop v. Mahoney, 70 Minn. 238, 73 N. W. 6, cited in L. R. A. 1916C, 22, note; Knatchball v. Hallett, L. R. 13, Ch. Div. 696.] Taking the above figure of $17,312.83, which the jury could have found under the evidence was the net proceeds of the sales even after allowing defendant credit for some disputed items, and allowing defendant credit for the Probate claims and costs thereafter paid which plaintiff admits were proper (as shown in the statement hereinafter set out), we find that they amount to $5,345.69; and that this would still leave defendant to account for $11,967.14. This is more than the amount of the verdict.

Defendant makes no assignment of error that the evidence was insufficient to show that there was as much due from him as the amount of the jury's verdict, but seems to erroneously assume that this is the question on his assignment that the court erred in overruling his demurrer to the evidence. If he had properly raised such a question, it would have to be decided against him, as the computation we have made demonstrates.

The statements in defendant's own brief would force us to the same conclusion. It is there admitted that no testimony but his own supports the following items:

| | |
|---|---:|
| Probate Court work (attorney's fee) | $ 600.00 |
| Special tax bill, 3220 Washington | 1,478.88 |
| Judgment against V. Lolordo | 781.00 |
| Judgment against V. Lolordo | 700.00 |
| Father Spigardi—note of V. Lolordo | 700.00 |
| Father Spigardi—Mass | 80.00 |
| Domenic Dimaggio—note of V. Lolordo | 600.00 |
| Total | $4,963.88 |

The jury, of course, did not have to accept his testimony about any of them and it cannot be a matter of great surprise that they did not accept it in view of defendant's testimony that he "had no canceled checks for any of these amounts;" that he "didn't personally keep a book or record!" and that most of his testimony about them depended upon his own recollection which was not always definite and certain. In addition to these amounts, defendant admits that there is $2,810.11 more that he can only obtain credit for upon the theory that the sale price of the property at 3103 Washington was $8100; that he paid all of the taxes out of that amount; and that he is entitled to credits for personal obligations of the administrator. Adding these two amounts together ($4,963.88 plus $2,810.11), there was an amount in dispute of $7,773.99. Disregarding all other disputed items except defendant's own $3900 claim against the estate, there is more than the amount of verdict of the jury, which they reasonably could have found that defendant was improperly withholding from the estate. While it seems to be admitted that defendant had filed a claim for $3900, and that it had been allowed against the estate, it was not shown either what classifications had been made of it in the probate court, what the total assets of the estate were, what the total demands allowed against the estate were, whether this claim was in a class which would be entitled to any payment at all, or, if so, how much. [See Section 182, R. S. 1929 (Mo. Stat. Ann., sec. 182, p. 108).]

It does appear that a claim for $2285 had been allowed in favor of the widow of Vincenzo Lolordo which would be entitled to preference over Plaintiff's claim. [See Sections 106-110, R. S. 1929 (Mo. Stat. Ann., secs. 106-110, pp. 67-72).] Certainly the mere fact that de-

fendant had an allowed claim for $3900 was not enough to authorize him to withhold that amount of the estate's funds from the administrator. If defendant's $3900 claim is valid and properly allowed and there are sufficient assets to pay the claims in the class in which it has been classified, he may still be paid the amount of it or whatever proportion thereof is paid on claims of its class whenever the probate court makes an order for a disbursement, which is applicable to claims of its class. "We cannot determine that question in this court upon this record."

We have arranged all the figures appearing in the evidence, to make a complete statement of the claims of the parties, to-wit:

| Item for which credit is claimed by defendant | Amount defendant claims he paid | Amounts admitted as proper credits by plaintiff | Amounts in dispute |
|---|---|---|---|
| Foreclosure sale— *3220 Washington* | | | |
| First trust deed and interest | $4522.00 | $4500.00 | $  22.00 |
| Court costs-appointment | 4.00 | 4.00 | |
| Foreclosure notice | 74.42 | 74.42 | |
| Revenue stamps | 20.50 | | 20.50 |
| General Taxes | 1237.87 | 1230.00 | 7.87 |
| Sprinkling taxes | 14.83 | | 14.83 |
| Broker's commission for sale | 617.50 | 617.50 | |
| Insurance adjustment | 13.24 | 13.24 | |
| First trust deed and interest | 3892.40 | 3892.40 | |
| Court costs—appointment | 4.00 | 4.00 | |
| Foreclosure notice | 71.06 | 71.06 | |
| Revenue stamps | 8.50 | | 8.50 |
| Special tax bill | 1478.88 | | 1478.88 |
| Other taxes | 1744.69 | 1400.00 | 344.69 |
| Broker's commission; Lauenstein | 215.00 | | 215.00 |
| Attorney's fee as trustee's attorney both sales | 500.00 | | 500.00 |
| Trustee's fee for both sales | 212.00 | | 212.00 |
| Second trust deed covering both properties | 600.00 | $ 600.00 | |

| Item for which credit is claimed by defendant | Amount defendant claims he paid | Amounts admitted as proper credits by plaintiff | Amounts in dispute |
|---|---|---|---|
| Claims and costs— | | | |
| *Lolordo estate* | | | |
| Probate Court Costs | $ 89.60 | $ 89.60 | |
| Probate Court notices Abandoned sales | 105.20 | 105.20 | |
| Other Probate Court notices | 24.60 | 24.60 | |
| J. C. Bensiek funeral expenses | 685.30 | 685.30 | |
| J. C. Bensiek, Cemetery lot | 143.00 | 143.00 | |
| Moceri Monument Co. monument | 625.00 | 625.00 | |
| Dr. John M. Dean | 249.00 | 249.00 | |
| Ely-Walker Dry Goods Co. | 1123.50 | 1123.50 | |
| Mercantile Trust Co. | 2300.49 | 2300.49 | |
| Funeral Mass. | 80.00 | | $ 80.00 |
| Attorney's fee for Probate Court work | 600.00 | | 600.00 |
| Judgment against V. Lolordo, | 781.00 | | 781.00 |
| Judgment against V. Lolordo | 724.00 | | 724.00 |
| Note of Father Spigardi signed by Giovanni Lolordo (the administrator) | 700.00 | | 700.00 |
| Note of V. Lolordo to Domenic Dimaggio | 600.00 | | 600.00 |
| Defendant's claim against the estate | 3900.00 | | 3900.00 |
| Defendant's claim against Giovanni Lolordo | 3900.90 | | 3900.90 |
| | $31,862.48 | $17,752.31 | $14,110.17 |
| Disputed claims | | 14,110.17 | |
| Total | $31,862.48 | $31,862.48 | |

The conclusions to be drawn from these figures are:
First, if defendant had only to account for $28,600 and all of his

claims were established, he would have paid out all of the sale money and $3,262.48 besides.

Second, if defendant is charged to account for 30,000, by reason of taking $9500 ($9800 — $300 commission) as the sale price of 3103 Washington, and if he is only credited with the amounts admitted by plaintiff to be proper ($17,752.31), then the difference between this amount and $30,000 is $12,247.69.

Third, the jury, if it took the latter amount, allowed defendant credit for over $1200 of the items in dispute.

Fourth, there was substantial evidence to warrant a submission of the case to the jury.''

Under the facts in this case, we are of the opinion that the jury arrived at a correct verdict and that respondent is guilty of wrongfully retaining and converting to his own use money belonging to the Lolordo estate.

In his brief and argument, the respondent has proceeded on the theory that this is an adversary proceeding. We do not so understand it. It is an investigation by the court into the conduct of one of its officers and is neither a civil action, nor a criminal proceeding, but a proceeding *sui generis,* the object of which is not to punish the offender, but to protect the court. [5 Am. Jur. 436, sec. 290; 6 C. J. 602, sec. 63; In re Richards, 63 S. W. (2d) 672, 676; In re Sparrow, 90 S. W. (2d) 401, 404; In re Noell, 96 S. W. (2d) 213, 218; State v. Peck, 91 Atl. 274.]

The trustee in a deed of trust is the agent of both parties, that is to say, the debtor and creditor, and his duties should be performed with the strictest impartiality and integrity. [Sherwood v. Sexton, 63 Mo. 78; Hauson v. Neil, 215 Mo. 256; Vannoy v. Duvall Trust Co., 29 S. W. (2d) 692.]

Under the provisions of the deeds of trust, the respondent was required to sell the real estate at 3220 and 3103 Washington Avenue, and, after such sale, use such of the proceeds as were necessary in paying off and discharging the costs and expenses of the sale, and the debts secured by the deed of trust, and turn the balance over to Vincenzo Lolordo, or his legal representatives. [Price v. Blankenship, 144 Mo. 203; Jones v. Sheppard, 145 Mo. App. 470; Wenzel v. O'Neil, 22 S. W. 459; Brown v. Bland, 229 S. W. 448.]

At the time of the foreclosure of the deeds of trust in question, Vincenzo Lolordo was dead, and John Lolordo had been appointed and was then the acting administrator of the deceased. Under the provisions of the deeds of trust and under the law of this State, it was the duty of respondent, after paying the costs, and the debts secured by the deeds of trust, to turn the balance over to John Lolordo, administrator. This he failed to do, but deposited such balance in his own name and in his own personal account, subject to be checked out by either himself or his secretary. The money was not deposited

in the account of the administrator, and distributed according to the directions, orders and supervision of the probate court, but was paid out of his own personal account, and in whatever manner he saw fit. The conduct of respondent, as developed in this case, discloses a complete failure to follow the law or the practice of the courts, and it is the opinion of the commissioner that respondent is guilty of the charges preferred against him unto the first paragraph of the information.

## Count II.

On the 2nd day of June, 1933, an indictment was returned by the Grand Jury of the City of St. Louis against respondent and one Joseph Hartman, in which they were charged with corrupting and attempting to corrupt a juror. A severance was had in this cause and respondent went to trial and was acquitted.

The facts giving rise to the indictment are substantially as follows:

On the 16th day of February, 1932, a criminal case was pending in the Circuit Court of the City of St. Louis against one Paul Richards, in which he (Richards) was charged with feloniously kidnapping for ransom one Alex Berg. The respondent and Howard Sidener had been employed to defend Richards, and the case was tried in February, 1932, and resulted in a failure of the jury to agree on a verdict.

At and prior to the trial of Richards, Herbert Keeton was associated with the respondent. Joe Hartman was, at the time, associated with Howard Sidener, but was a frequent visitor at the office of respondent.

A short time before the trial of Richards, while Keeton and Hartman were in the office of respondent, the trial of Richards was discussed with respondent. The respondent showed them a bunch of cards which he kept in an index file and told them it was the jury list for Division No. 10 in which Richards was to be tried, and asked them to look over the list of prospective jurors and ascertain if there was anyone on the list they knew. Keeton and Hartman looked over the list and Keeton advised respondent that he did not know any of them, but Hartman told respondent that he knew a man on the list by the name of Edward Anna who formerly worked for the Metropolitan Life Insurance Company. Respondent requested Hartman to go out and see Anna, but Hartman replied that he was afraid to, because he would likely get into trouble. The respondent said, "Never mind, I will take care of that," and told Hartman he would pay him, and that all he wanted was a hung jury, and that if he won the Richard's case he would be the greatest lawyer in the world. On the day before they started to take testimony in the case, Hartman advised respondent and Keeton that he had seen Anna and that Anna was 100 per cent.

Edward L. Anna was one of the first men to be called for examination as to his qualifications as a juror in the Richard's case. After his

examination by the State and defendant, he was excused by the court and directed to report the following day. At the time he was summoned as a juror, he was in the employ of the Metropolitan Life Insurance Company. The selection of the jury in the Richard's case was not completed on the first day, and, on the following morning about 7 o'clock in the forenoon, Joseph Hartman appeared at the home of Anna, knocked at the door, and, after some conversation, said to Anna: "You know Paul, so do all you can for him." Anna states that he told Hartman to go to Hell and started shoving him out the door, and, at the same time, told him, "I will give him the benefit of the doubt."

Anna was accepted as one of the twelve jurors to try the case. The trial consumed about ten days. The case was finally submitted to the jury, and Anna, at all times, voted for the acquittal of Richards. His conduct resulted in the failure of the jury to agree on a verdict in the cause.

During the trial of Richards, Joe Hartman and Herbert Keeton were frequent visitors to the court room. They approached the counsel table during the trial for short conferences with respondent and Sidener. They brought to the court room books and papers from the office of respondent and apparently were very much interested in the trial.

After the trial of the case in Circuit Court, Joseph Hartman called Anna, and they went to the office of respondent. In his testimony, Anna stated that he thought it was about a week after the trial, but, when it was shown that respondent was in the Hospital at the time, he fixed the time at some six or eight weeks thereafter. On the way to respondent's office, Hartman advised Anna that he thought he would get about $100, and that he (Hartman) ought to have $50 of this amount. Anna stated he would not get it. Respondent was not in his office, when they entered, but Keeton and Miss Simpkins were there. After waiting for a time, the respondent came in and he and Hartman went into a private office. They later called Anna into the office, and, while there, Keeton entered and saw respondent give Anna some money. Anna stated that respondent gave him $20 and told him to return the following week. He returned, and Miss Simpkins and Keeton were in the office at the time, but respondent told Anna that he did not have anything, but thought he would get about $100, and asked him to return the following week. Anna returned, as requested. Miss Simpkins, Keeton, and Hartman were present, and Anna states that respondent paid him at that time $30, a $20 bill and a $10 bill. About a week after that Anna went back to respondent's office and respondent gave him a $20 bill. The week following he returned to the office and respondent gave him $10 and told him that was all he would get. Anna thought that respondent had paid him $100 and so did not return.

On cross-examination Keeton was asked about his activities in and about Joplin, Kansas City, Tulsa, Oklahoma, and other places. He was also examined about business he brought to respondent's office, his connection with a murder case, and other matters for the purpose of effecting his credibility as a witness.

It was also shown that he had been employed at the Planters' Hotel, the Statler Hotel, Mayfair Hotel, and Terminal Hotel and that he had been discharged from the Mayfair Hotel for selling whiskey during prohibition days. It was also shown that Paul Richards had instituted a suit against the St. Louis Post-Dispatch for the sum of $250,000; that Keeton had testified before the Grand Jury, which was making inquiry into the conduct of respondent; and after he testified, associates of respondent came to his home on different occasions; that the associates were Adolph Fiedler, a former Justice of the Peace at Manchester, Missouri, Felix McDonald, a reputed gangster, and Bart David, whom respondent was defending in the Kelley kidnapping case; that Keeton feared these parties would do him personal harm and wanted to leave St. Louis, and the Post-Dispatch furnished him $1200 for that purpose.

It further appeared that Keeton, his brother and sister visited their mother at Herrin, Illinois, and, on their return, Keeton was advised by his brother that respondent desired to see him and would pay him, if he would not testify against him in the case of State against Lacy. Keeton, his brother and Richards met at West Pine and King's Highway and discussed the amount that Keeton was to receive and how it was to be paid. Shortly thereafter another conference was had in the office of Alvin Hackman at Clayton, Missouri. Hackman was not present at the time, but Richards submitted to Keeton several pages of printed matter and directed him to write it off in longhand. He was advised that the purpose of this statement was that, if he testified in the Lacy case, this statement would be used to contradict him. After he wrote this out, signed and swore to it, he was paid $1000. Keeton stated that his life was in danger and that he did this to protect himself.

It also appears that just a few days before the trial, Keeton and his brother drove out to the home of respondent on Manchester road and that respondent came out of the driveway and said to him, "Now what are you doing here? You ought to be five states away from here; I paid you that money, and I don't want you to testify." Keeton answered, "Well, I am not going to." Respondent said, "It sure looks like you are. Get five states away from here; don't just go into Illinois." and Keeton said, "All right."

Edward L. Anna testifies on behalf of the State in the case of State v. Lacy. In the hearing before the Bar Committee, he was called and testified as a witness. In the proceedings before the Commissioner, he was again called and testified. His testimony, in

each of these hearings, has been transcribed and examined by the Commissioner. There are some discrepancies in his testimony as to dates and places, but, as a whole, it is substantially the same.

A transcript of the evidence of Herbert Keeton, given in the trial of State v. Lacy, was offered in evidence. Keeton testified to being present when Anna was first discussed for jury service in the Richard's case. He heard respondent tell Hartman to go out and see Anna. He was present when Hartman reported that he had seen Anna and that Anna was 100 per cent. He was in Lacy's office when Hartman and Anna came in. He saw respondent pay Anna some money. He admits that during the Richard's trial, he visited the court room frequently and discussed different matters with respondent.

Both Anna and Keeton underwent a long and severe cross-examination, but, on the matters involved in this controversy their testimony was not shaken.

The respondent did not testify before the Commissioner, but his testimony before the Bar Committee and in the case of State v. Lacy was offered in evidence. It consisted principally of a general denial of the charges made against him in the information.

It is the opinion of your Commissioner that the evidence supports the second paragraph of the information.

The respondent contends that the Commissioner erred in admitting the evidence of Herbert Keeton, given in the trial of State v. Lacy. It was shown that Keeton was absent from his usual place of abode in the City of St. Louis; that informants had made a diligent search for him and had been unable to locate him; that in the State case the respondent was charged with corrupting and attempting to corrupt Edward L. Anna, a juror, in the Paul Richard's case; that in the information, the informants desired an inquiry into the same charges; and that respondent had an opportunity to and did actually cross-examine Keeton in the State case. Under this showing of the facts, it is the opinion of the Commissioner that the evidence of Keeton in the former trial was competent. [22 C. J. 430, sec. 515; 10 R. C. L. 970, secs. 151, 153; Minea v. St. Louis Cooperage Company, 179 Mo. App. 705, 716; McCracken v. Schuster, 179 S. W. 757, 759; Welp v. Bogy, 277 S. W. 600; Sheets v. Regneir, 221 S. W. 417, 419; Ray v. Henderson (Okla.), 144 Pac. 175.]

The admission to the Bar and a license to practice his profession does not confer upon one any vested right to continue in such practice. His right to continue in the practice is dependent upon his remaining a fit and safe person to exercise the privilege. It is the duty of an attorney to assist in upholding the integrity, dignity, and purity of the courts. They are entitled to these special privileges, under the law, for the purpose of enabling them to be useful to their fellow citizens in the ascertainment, prosecution, and defense of legal and

equitable rights, but, when the conduct of an attorney discloses that he is an unfit and unsafe person to be entrusted with the responsibilities and obligations of an attorney, his right to continue in the enjoyment of his professional privileges may and ought to be declared forfeited. When such facts appear, it is the duty of the court, by virtue of its inherent power to control the conduct of its affairs, to investigate and inquire into such conduct. The inquiry should not be limited or circumscribed by the strict rules of evidence.

In this proceeding the informants are investigating and making an inquiry into the conduct of respondent in a former trial. In his testimony in that trial, Keeton described the conduct of respondent. He was properly cross-examined and we think that his testimony is admissible in this inquiry. [5 Am. Jur. 417, sec. 261; In re Keeman, 192 N. E. 65; In re Maberry, 3 N. E. (2d) 248; State v. Peck, 91 Atl. 274; In re Richards, 63 S. W. (2d) 672; In re Sparrow, 90 S. W. (2d) 401.]

It is the contention of respondent that, under the evidence in this inquiry, he has not been shown guilty of corrupting, or attempting to corrupt a juror. The facts have been fully stated and warrant a conclusion to the contrary. [In re Keenan, 192 N. E. 65; In re Reynolds, 107 N. W. 144; In re Maberry, 3 N. E. (2d) 248.]

In In re Reynolds, *supra,* the facts were briefly as follows:

Cummings was one of the jurors. Reynolds took this juror to a saloon, bought him a drink, a bottle of whiskey, and gave him a dollar and expressed a desire that his client would be given a verdict. The gist of the offense was an attempt to influence the action of the juror by furnishing him whiskey and money. The court in holding respondent guilty of misconduct said:

"The impropriety of such conduct is so manifest that further comment is unnecessary. We, therefore, hold that the charge has been sustained, and that Mr. Reynolds has been guilty of breach of professional duty as an attorney and Counselor-at-Law which subjects him to discipline."

In In re Maberry, *supra,* the facts were briefly as follows:

During the trial, in one case, two men approached one of the jurors and asked him if he wanted to make $50 easy. Upon his refusal they left $5 on the table. After the verdict this juror met one of the men near the juror's home. The man asked how things were going and the juror said, "They win."

Respondent represented plaintiffs in another case and, during the trial, a man went to the home of a juror and asked which way the case was going and if he would like to have a Christmas present. Just before the verdict, in the same case, two men came to the home of another juror and wanted him to bring in a verdict in favor of Pierce for a named amount and promised to see that he got a Christmas present of not less than $100.

It was shown that respondent had been guilty of the same sort of conduct in other cases.

The Supreme Judicial Court entered an order removing respondent from the office of an attorney at law and this order was affirmed.

## Count III.

The lists containing the names of jurors to be summoned for services in the Criminal Divisions of the Circuit Court of the City of St. Louis were prepared in the main office of the Sheriff in the Civil Courts Building, and, when completed, were delivered by a messenger to the office of the Special Deputy in charge of the Sheriff's office for the Criminal Division in the Municipal Courts Building. Henry West, known as "Buddy" West, delivered these lists to the office of the chief Deputy Sheriff in the Municipal Courts Building, and had been for some time.

Under the prevailing custom in the City of St. Louis, the names were not made public, and were kept secret until after service had been completed and the lists turned over to the Deputies of the various Criminal Divisions on the Monday morning of the week when the jurors were summoned for service.

On the 20th day of March, 1933, the police officers followed West from the Sheriff's office to the office of respondent in the Plaza Building. They saw him enter the office and, as soon as he left, they entered, and found Odessa Simpkins, the stenographer and secretary of respondent in one of the rooms with the door closed. They knocked on the door, and, on entering the room, found sheets of paper in the typewriter and the jury lists were taken by the officers. Miss Simpkins stated to the officers, at the time, that she had been receiving lists of this kind from West for a period of about a year, and that respondent had instructed her to pay West the sum of $25 for this service. Sam White and his two brothers occupied a portion of respondent's suite of offices. He testified that Odessa Simpkins had done some work for him and that he had paid her his *pro rata* share for her services. He stated that he had never seen the jury lists and that neither he nor his brother had anything to do with respondent's affairs during his absence, and that they knew nothing about the jury lists in question. It was also shown that the records of Divisions 10, 11 and 12 of the Criminal Divisions of the Circuit Court of the City of St. Louis had been examined and that respondent represented defendants in cases under the following dates: March 6, 1933, March 8, 1933, March 14, 1933, April 3, 1933, April 11, 1933, April 18, 1933, and May 4, 1933.

It is contended by informants that the conduct and activities of respondent in connection with obtaining the jury lists were improper. We have been unable to find a statute in Missouri covering the question involved. In fact, informants, in their brief, advise us there is

no such statute. However, it was shown by officials in both the office of the Circuit Clerk and Sheriff that the names of the persons summoned for jury service in the Criminal Division of the Circuit Court were not disclosed, but were kept secret until after the lists had been turned over to the deputies in the various criminal divisions on the Monday morning of the week, when the jurors were to serve. Some of these witnesses had been in the offices of the Circuit Clerk and Sheriff for more than fifteen years, and testified that this had been the prevailing custom over such period of time. It was also shown that the officials and attorneys, having business with these offices, were familiar with this rule or custom, and had uniformly observed it.

The respondent is, and has been for many years, one of the leading lawyers in the City of St. Louis, trying both Civil and Criminal cases. He was familiar with the rule and custom prevailing in both the offices of the Clerk of the Circuit Court and Sheriff, and knew it was wrong for West to turn over to him, or his office, the jury lists in question. He certainly knew it was wrong to request, or receive such lists. However, these lists were found in his office. The names, thereon, were being copied by his secretary. West was paid for their delivery. Respondent had cases in the Criminal Divisions of the Circuit Court where these jurors were to serve. These facts were established by a number of witnesses.

Why did respondent desire these lists, and what purpose would they serve? Why did he spend his money for this information, and would it enable him to obtain better results in the trial of his cases? Would such information enable him to obtain an unfair advantage of his adversaries? We are unable to make answer to these questions. The lawyers, although officers of the court, did not know who was to appear for jury service until on Monday of the week when the jurors were to appear for service. In obtaining this information, the respondent violated a rule and custom which had existed for years. He caused a trusted employee, who had been in active service for many years, to violate his trust. He knowingly violated the rule and custom of the Clerk of Circuit Court and Sheriff. His conduct excited criticism and brought reproach upon the profession. For his conduct in this matter, he should be disciplined.

At the time the officers entered respondent's office, Odessa Simpkins was making a copy of the names from the official jury list. She was admittedly the secretary of respondent. This was a part of her duty. It was being performed for respondent. While performing this duty she admitted to the officers that these jury lists had been delivered to the office for some time by West and that she had been directed by respondent to copy the names, and pay West for bringing them over.

The respondent, in his brief, contends that this testimony is rank heresay and should not be considered. It is our opinion that the

testimony was admissible. It was the declaration and admission of an agent, in reference to the business of her principal. This duty had been assigned to her and she was engaged in performing it at the time the wrongful act was being perpetrated. [Bergeman v. Railroad, 104 Mo. 77, 86.]

### Count IV.

On the 16th day of February, 1932, Paul Richards was an attorney at law, and was then, and had been for some time engaged in the practice of his profession in the City of St. Louis; that prior to such date, he had been accused, and charged, in an indictment returned by the Grand Jury of the City of St. Louis, with participating in the felonious kidnapping for ransom of one Alex Berg; that he went to trial in this case on the above date, and respondent represented him in the trial of said cause, and, therefore, knew all the facts in the case; and that due to said charges, and the facts developed therefrom, disbarment proceedings were instituted against Richards in the Supreme Court of the State of Missouri, which resulted in his disbarment from the practice of law in this State. Subsequent to the disbarment of Paul Richards, the respondent took him into his office, where, the testimony shows, he investigated and examined the law for respondent, interviewed witnesses, advised clients, wrote contracts, prepared pleadings, and, in fact, attended to all of the general office work of a lawyer incident to his profession.

In his brief, the respondent admits that Paul Richards, subsequent to his disbarment, was in his office; that he did investigate and examine the law for him; that he interviewed witnesses, advised clients, wrote contracts, and prepared briefs; but respondent contends that such work was not performed for him by Richards as an attorney, but as a clerk. We are unable to view this relation in the light contended by respondent. Richards was a lawyer. It required a man with a knowledge of the law to do the work which it was shown he performed. Richards could not have performed this work, if he had not had a knowledge of the law. In taking Richards into his office and permitting him to do the work heretofore described, the respondent impliedly at least vouched to his clients and for the public the honesty, integrity, ability and trustworthiness of Richards. The respondent was permitting Richards to perform duties which the Supreme Court had prohibited him from doing. The respondent was impliedly recommending Richards, as worthy of trust and confidence, to his clients and the public, while the Supreme Court had just said that he was unworthy of such confidence and trust and unfit to practice law. It is, therefore, impossible for us to approve such conduct and we think that respondent should be disciplined.

In the case of People ex rel. v. Czarneckl (Ill.), 109 N. E. 14, the function of an attorney at law is described, as follows:

"A license granted by this court to practice is a guarantee that, so far as this Court is advised, the person holding such license is a fit and proper person to assume the responsibilities, to enjoy and safekeep the confidences of others, and to aid and assist them in the care and management of their legal business and affairs. [People v. Shirley, 214 Ill. 142, 73 N. E. 303; People v. Payson, *supra*.] In maintaining this high standard both the people and the courts are alike interested (People v. Palmer, 61 Ill. 255); and to the extent that this Court has guaranteed the fitness of one to assume these responsibilities, it possesses the inherent power to recall its certificate whenever it is clearly proven that the bearer is no longer worthy of being entrusted with these trusts and confidences the license indicates he was worthy to assume."

In the case Re Petition of Law Association of Philadelphia (Pa.), 135 Atl. 732, the Court said:

"Before admission to the Bar the court must be satisfied of the moral fitness of an applicant, and, if it subsequently learns that the attorney is no longer to be trusted, it becomes its duty, on proper application, to see that he ceases to be held out as worthy of professional employment."

In the case of People v. Meyerovitz (Ill.), 116 N. E. 189, the court, in describing the opportunities for an attorney to impose and prey upon his clients, had the following to say:

"The legal profession affords unscrupulous attorneys exceptional opportunities to impose and prey upon those who entrust them with business, and it is essential that members of the profession in their relation to the public and with clients, shall be strictly honest and worthy of trust and confidence."

In our examination of the record in this case we have been driven to the conclusion that respondent has failed to maintain the dignity, honor, and trustworthiness due his profession and that he is guilty of the charges set forth in the information and should be disbarred from the practice of law. It is, therefore, the recommendation of the Special Commissioner that the respondent be disbarred from the practice of law in this State.

PER CURIAM:—We hereby adopt the report, finding of facts, and conclusions of law of our Special Commissioner heretofore filed herein, as and for the opinion of this court, and order the license of respondent Verne Lacy to practice law in the State of Missouri revoked, with costs assessed against respondent.

We take this occasion to reaffirm what we said in In re H—— S——, 69 S. W. (2d) 325:

". . . while a lawyer is not a public officer in the constitutional or statutory sense of the term, he is an officer of the court, and, as such, owes a definite obligation to the public as a whole in the matter

of the proper administration of justice. His license to engage in the practice of the law is his, not of right, but as a privilege granted him by the State, which comes to him burdened with conditions of subsequent good behavior and professional integrity, and sets him and his profession apart from the general public upon a high and dignified plane which is circumscribed by the requirements of good moral character and special qualifications which are prerequisites to admission to the bar.

. . . . . .

And in a more special and personal way it is his continuing duty to maintain the high purposes and functions of both bench and bar as instruments of fair dealing between man and men. As an officer of the court he is, like the court itself, an agency or instrument to advance the ends of justice. He serves as a priest in the temple of justice, and if he be false to his vows, then justice itself is imperiled, if not entirely thwarted. He has the property, and sometimes the liberty and the very life, of his client in his safe-keeping; and so jealously does the law regard the relation of attorney and client that it puts communications between the two in much the same priviledge category as communications between husband and wife. The future of the nation depends very largely upon the maintenance of justice pure and undefiled; and the conduct of the lawyer must support and create confidence in the public mind in the administration of justice, and not be of a character to bring reproach upon the legal profession or to alienate the favorable opinion which the public should entertain concerning it. Failing in this, it is not only within the power, but it is the duty, of the court to remove the lawyer who is false to his trust from the ranks of the profession to the end that the courts, the administration of justice, and the public at large may be protected against him.''