[S. F. No. 16715. In Bank. Oct. 30, 1942.]

HAZEL UTZ, Petitioner, v. THE STATE BAR OF CALI-
FORNIA, Respondent.

Leo R. Friedman for Petitioner.

Bert W. Levit and Robert L. Dreyfus for Respondent.

THE COURT.—By writ of certiorari, the petitioner has challenged the recommendation of The State Bar that she be suspended from the practice of law for a period of two years. Although a local administrative committee found that she should be disbarred because (1) she forged the signatures of the sureties on two bonds filed in estates being probated by her; (2) she altered and then filed with the probate court a receipt of a distributive share from an estate after signature by the distributee; and (3) she improperly solicited professional employment and split professional fees with unli-

censed individuals, the Board of Governors, upon adopting all of the committee's findings, recommended the lesser discipline.

As her chief complaint, the petitioner urges that her guilt was not established by sufficient proof under the rules of evidence governing proceedings in which an attorney at law is charged with misconduct. More specifically, she claims that most of the charges are based upon the complaint and testimony of one Hollister Staniels who, she maintains, was so actuated by bias and prejudice as to render his testimony unworthy of credence. The local administrative committee did not believe this witness, she asserts, finding against her because "documentary evidence, as well as testimony elicited from the respondent herself, amply fills in any gap in the proof required to sustain the charges, even though we reject from our consideration such testimony given by Staniels, not otherwise corroborated." But without credible testimony by the principal witness against her, she argues, the findings should be in her favor.

The evidence concerning each charge may be briefly summarized as follows:

### The Forgery of the Bonds.

██ Hollister Staniels testified that, on one occasion, he found the petitioner signing the names of R. L. Gray and G. S. Conger as sureties to a bond with two different pens and two different bottles of ink, one black and one blue. She told him, said Staniels, that she was accustomed to do so, and "it was all right." A handwriting expert testified that the names of these persons, which appeared on two bonds filed in estates in which the petitioner was the attorney, had, in his opinion, been written by the same person. His opinion was based, at least in part, upon a comparison of the signatures of R. L. Gray and G. S. Conger on three attachment bonds filed in actions in which Walter E. Dorn represented the plaintiffs. Miss Utz had been employed in Mr. Dorn's office about the time these bonds were filed. Neither of these signatures, said the expert, were by the individual who signed both names to the probate bonds. The witness, however, was unable to say that the petitioner did or did not sign the names of the sureties on the probate bonds, although he had compared the signatures with numerous specimens of her handwriting. Although he found points of similarity between Miss Utz's writing and the signatures on the bonds, he was not satisfied

that they were characteristics and not coincidences. But he found no "dissimilarity which would break the similarity" between Miss Utz's handwriting and the signatures on the probate bonds.

The petitioner testified that she knew Gray and Conger well and that they signed the bonds in her office when she was present although not before the attesting notaries. Gray is now deceased and Conger is in Washington. Gray had lived in San Francisco with his married daughter, but the petitioner did not know her name or where she lived. She met him when he came to her to have a building contract drawn. Thereafter he frequently came to her office. According to the petitioner, Conger had been living in an Oakland rooming house and worked in a grocery store as a clerk. Someone told her that at the time of the hearing he was in Washington, but she could not remember who gave her this information.

She met Conger when he had some work done by her stenographer. Both Gray and Conger owned personal property, she said, although she did not know whether or not either had a bank account. They were elderly men of about the same age. She had no copy of the building contract she drew for Gray, nor did she have any account in her books in his name. He paid her $5 for the building contract. Thereafter he "kept coming in and asking how things were."

Concerning the signing of the bonds, the petitioner explained, Gray would come in now and then when he happened to be around. He and Conger did not come to the office at the same time. She just happened to have the bond ready for signature when each of them came in. Neither of the estates in which the questioned bonds were used exceeded $100 in value.

The petitioner contends that Staniels' testimony should be rejected in its entirety. And since the evidence presented by the handwriting expert does not tend to prove that she signed the names of Gray and Conger to the bonds, disbelief of her testimony, she argues, will not supply this necessary proof.

But charges of professional misconduct may be established upon circumstantial evidence. (*McCue* v. *State Bar,* 4 Cal. 2d 79 [47 P.2d 268].) The petitioner testified that Gray and Conger signed the bonds in her office and in her presence. The handwriting expert stated positively that the signatures on the probate bonds were made by one person. This evidence

presents an irreconcilable conflict, and improbabilities in the statements of the petitioner as to the facts surrounding the execution of these bonds were also properly considered by the committee. She did not know where either Gray or Conger lived when, as she asserts, they were visitors to her office, or what became of them. Another circumstance, which undoubtedly did not escape the committee's attention, is the fact that, although the men came to the petitioner's office only occasionally and separately, and she did not know how to reach them, their names always appeared upon the same bonds. There are also other inconsistencies in her testimony regarding their visits.

Upon this record and bearing in mind that the trier of fact had an opportunity to observe the attitude and demeanor of the petitioner in giving her testimony, factors of importance in determining her credibility (*Hizar* v. *State Bar*, 20 Cal.2d 223, 227 [124 P.2d 812]), the committee's findings are amply supported by substantial evidence.

### Alteration of Receipt of Distributive Share.

Mary Hamilton, a resident of Australia, as an heir of Daniel Sheehan, deceased, was entitled to $572.21 on deposit in this country. By agreement, Miss Utz was to retain everything over $300 for all costs and services rendered by her in probating the estate of Daniel Sheehan and securing distribution of the legacy to Mrs. Hamilton. In her account as administratrix, Miss Utz was allowed a fee of $50.15, leaving, after the deduction of costs and expenses, a net amount of $477.16 to be distributed. She remitted $300 to Mrs. Hamilton, who returned the receipt acknowledging the payment of that amount. The figures ''$300'' were altered to ''$477.16,'' and, as so altered, the receipt was filed with the probate court and the petitioner discharged. Miss Utz testified that her secretary admitted to her that she had made this change in the receipt. However, not only was this hearsay statement not corroborated by the secretary but, upon the objection of the petitioner, the secretary was not allowed to testify.

The petitioner argues that as Mrs. Hamilton was not defrauded by the alteration of the receipt, she cannot be guilty of misconduct. But if the petitioner had filed Mrs. Hamilton's receipt for $300, she could not have obtained her discharge as administratrix. Conceding that Mrs. Hamilton would have signed a receipt for $477.16, Miss Utz procured

an order of the probate court upon a document which had been altered after signature by the legatee. This was a deliberate misrepresentation to the court, and the fact that the client was not defrauded does not excuse the attorney's dishonesty. In the words of this court upon another occasion, ". . . the plan conceived by petitioner was unworthy of an ethical practitioner. Honesty in dealing with the courts is of paramount importance, and misleading a judge is, regardless of motives, a serious offense." (*Paine* v. *State Bar*, 14 Cal.2d 150, 154 [93 P.2d 103].) The committee had a right to disbelieve the testimony of the petitioner as to the alteration, and the evidence before it concerning the transaction fully justifies the finding that Miss Utz altered the receipt and filed it with the court.

*Solicitation of Business and Division of Fees.*

 The petitioner is charged with soliciting legal business from Mary Hamilton, Patrick J. McCaffrey, and L. O. Thieme & Company. So far as L. O. Thieme & Company is concerned, Miss Utz admits that the evidence discloses a solicitation by her of professional employment, but claims that the record is void of any evidence showing that Thieme was not an attorney at law. Since, she urges, all presumptions are in favor of innocence and all intendments in favor of the accused, this court should presume that L. O. Thieme & Company is an attorney at law because, under such circumstances, her acts would not constitute an offense.

This court will indulge in no such unwarranted presumption. Moreover, Miss Utz has never asserted that Thieme is an attorney at law. On the contrary, at the hearing she referred to L. O. Thieme & Company as an "investigator."

 Concerning the charge as to Patrick J. McCaffrey, the petitioner maintains that in letters which she sent him she only stated that one Maurice Shannon died leaving an estate, and asked if he was related to the deceased. Subsequently she wrote asking for an appointment. This, says the petitioner, demonstrates that no solicitation was made "of any kind or character." But for what purpose other than her retention as his attorney could she have wanted an appointment with McCaffrey?

 The charge of solicitation from Mary Hamilton should be considered in connection with the relations of the petitioner with Hollister Staniels and Associates. Hollister Staniels was engaged in the business of locating the heirs entitled to dor-

mant and unclaimed bank deposits. He testified that he and the petitioner entered into a partnership arrangement by which they were to divide equally all profits realized from the enterprise. Staniels was to make all the investigations and secure from those entitled to the deposits contracts fixing his compensation at 50 per cent of the amount obtained. Miss Utz was to do all the legal work, principally the probating of the depositors' estates, if this was necessary.

The petitioner's version of her relation with Hollister Staniels and Associates is quite different. Staniels, she says, had been working as a clerk in her office, serving legal process and doing other "little things" around the office. But because he wanted an office address for his business of Hollister Staniels and Associates, he offered to give her for rent his services as clerk and one-half of anything he might "make on the business for expenses and any legal advice [she] might give and for the telephone and any stationery . . . and any use of the stenographer," regardless of whether she did any work on the particular case or not.

To support her testimony, Miss Utz introduced a letter of Staniels to The State Bar of California in which he stated that at no time did he and Miss Utz have "any agreement either written or verbal whereby she could claim any interest in the concern of Hollister Staniels & Associates . . . there is no partnership agreement. . . ." But Staniels produced a canceled check payable to Miss Utz for $300, $250 of which he asserts was for his share of the office expenses. And one Glenn A. Reels testified that, during the period the firm of Hollister Staniels and Associates was located in Miss Utz's office, he entered into an arrangement with Staniels and the petitioner whereby, on all fees from claimants secured by him, he was to receive one-third, and they were each to receive one-third.

Yet accepting the petitioner's explanation of her arrangement with Staniels, the record shows that she actively participated in soliciting business from Mrs. Hamilton. Hollister Staniels and Associates wrote Mrs. Hamilton a letter stating that they were engaged in the business of locating heirs to "unclaimed assets and estates" and had discovered that she was the sole heir of one Daniel Sheehan who had left a small estate in the United States. "Of course," the letter continued, "we would have to be compensated for our work in this matter and for our investigation in locating you. . . . Our charges on such small matters usually amount to

50% on the amount recovered, we to advance all costs, attorney's fees, etc. . . . I am having our attorney write you a letter which is enclosed herewith, which will further explain this matter. I am enclosing you one of our contract forms, and if this is agreeable to you, kindly return the same to us."

The enclosed letter of Miss Utz read in part as follows: "My client Hollister Staniels and Associates has asked me to write to you in the matter of the estate of the above named party. Mr. Staniels has done considerable investigation in this matter and has presented the result of his work to me for my opinion. . . . It is my opinion that Mr. Staniels' firm can obtain sufficient proof that you are entitled to the £100 estate left in this country by a Daniel Sheehan. . . . In view of the fact that I am so far away from you I am enclosing you herewith a letter of reference from my Bankers who are known to be one of the largest institutions in this country. If you should desire to have your local attorney correspond with me, that will be perfectly agreeable. . . . I deem it advisable for you to authorize Mr. Staniels to proceed with this matter, and . . . if you do so I will exercise the utmost diligence in obtaining this fund for you promptly. . . ."

The petitioner's letter was written prior to any retainer by the claimant, and she could only be paid for her "opinion" from proceeds to be realized from the administration of the estate of Daniel Sheehan. The obvious purpose of that letter was to influence Mrs. Hamilton to retain Hollister Staniels and Associates, who, in turn, would retain her to probate the decedent's estate. Clearly this was a solicitation of legal business.

The record further shows that she had employed one William Lancaster as a "law clerk." He was also an investigator operating under the name "Hamilton Company." It appears that Miss Utz sent a letter, as attorney for Hamilton Company, to Patrick McCaffrey, before the retainer by McCaffrey of Hamilton Company, in which she stated that it would "be to your advantage to see me" relative to a possible claim of McCaffrey to an unclaimed deposit.

The employment by an attorney at law of a layman, who was at the same time a client actively engaged in procuring business which often necessarily involved the use of legal services, and where both the attorney's and the client's remuneration was often made contingent upon her performance of such

services, discloses an arrangement analogous to many schemes expressly condemned by this court as unprofessional conduct. Arrangements whereby attorneys have accepted professional employment known by them to have been solicited by lay persons engaged in the business of negotiating agreements between themselves and others having possible legal claims, whereby the soliciting persons were able to control negotiations or litigation, and where the attorney and the solicitor were to share on a contingent basis in the proceeds of the employment, on numerous occasions have been declared to be violations of the Rules of Professional Conduct. (*Dahl* v. *State Bar,* 213 Cal. 160 [1 P.2d 977]; *Irving* v. *State Bar,* 213 Cal. 81 [1 P.2d 2]; *Howe* v. *State Bar,* 212 Cal. 222 [298 P. 25]; *Smallberg* v. *State Bar,* 212 Cal. 113 [297 P. 916]; *Shaw* v. *State Bar,* 212 Cal. 52 [297 P. 532]; *Smith* v. *State Bar,* 211 Cal. 249 [294 P. 1057, 73 A.L.R. 393].)

■ To support her contention that she was not guilty of "fee-splitting," the petitioner directs the attention of the court to the fact that, in cases where she performed legal services for Staniels, her 50 per cent of the proceeds reserved by Staniels under his contracts with the claimants amounted to a sum greatly in excess of any fees that could be allowed her by law as an attorney in the estates. Therefore, she concludes, when Staniels received his half of the contract fee, he did not share any portion of the amount awarded her as attorney's fees.

Assuming this argument to be sound so far as Staniels is concerned, the petitioner admitted at the hearing before the local committee that she agreed to divide with L. O. Thieme & Company any fee which she might earn as the representative of any heirs of one Jonas Sauble, deceased, which L. O. Thieme & Company could locate. And her letter to L. O. Thieme & Company contained the statement: "However, it did occur to me that this party [an heir of Jonas Sauble] might like local representation and if we obtained even a small percentage, even five per cent I could split fifty-fifty with you and still make a fee."

All of the charges against the petitioner are supported by substantial evidence. She is therefore suspended from the practice of law for a period of two years commencing thirty days after the date of this decision.