[L. A. No. 18883. In Bank. Aug. 4, 1944.]

ERWIN P. WERNER, Petitioner, v. THE STATE BAR, Respondent.

Mark L. Herron for Petitioner.

A. W. Ashburn and Jerold E. Weil for Respondent.

TRAYNOR, J.—The Board of Governors of The State Bar of California has recommended that petitioner be disbarred on the ground that in 1937 he proposed to William McNeil that the latter give him $2,500 for the purpose of bribing William E. Simpson, a Deputy District Attorney of Los Angeles County. The ensuing transaction led to petitioner's indictment or attempted grand theft, and he was tried three times. On the first trial the jury disagreed; on the second the verdict was guilty, but the judgment was reversed in the District Court of Appeal (*People* v. *Werner,* 29 Cal.App.2d 126 [84 P.2d 168]) ; on the third, petitioner was again convicted, but the judgment was reversed in this court. (*People* v. *Werner,* 16 Cal.2d 16 [105 P.2d 927].) While petitioner's appeal

was pending in this court, The State Bar instituted proceedings against him, charging him with having been convicted of a felony. After the conviction was reversed, the notice to show cause was amended to charge that petitioner made the offer to McNeil with the intention of defrauding him. The local committee found that petitioner committed the acts charged. The Board of Governors found that petitioner offered to use the funds he solicited to obtain the illegal dismissal of a charge against McNeil, and that he made the offer with the intention of defrauding McNeil. The only evidence introduced before The State Bar was the record of the third trial. Early in the course of the proceeding, petitioner stipulated that "the testimony as transcribed by the reporter in the case of The People of the State of California versus Erwin P. Werner . . . may be read and used in this proceeding with like force and effect as if the witnesses whose testimony as found in said transcript were on the stand and testifying in person, subject to all legal objections either as to form or as to substance." Petitioner concedes that if this stipulation is applicable, it is irrevocable, and that the evidence was properly admitted, but contends that the stipulation became inapplicable because the notice was amended to charge specific acts instead of conviction of a felony and that his objection to the admission of the transcript of the criminal trial should have been sustained.

The stipulation provides that the transcript is admissible "in this proceeding." When it was made, it was reasonable to expect that the proceeding would involve precisely the type of amendment made. Since The State Bar proceeding was stayed pending outcome of petitioner's appeal, and since that outcome was unknown, the proceeding could not be continued, in the event of a reversal, without an amendment of the notice to make it charge the commission of certain acts involved in the criminal trial rather than conviction at that trial. The stipulation could hardly be construed as applicable only to a charge of conviction of crime without becoming meaningless, for it provides for the reading of the testimony of witnesses, and there would be no reason for reading such testimony merely to establish conviction of a crime.

Even if the stipulation were regarded as inapplicable, this evidence was admissible. The transcript of the evidence at the criminal trial was admissible hearsay in the State Bar

proceeding. Such hearsay is admissible in civil proceedings if it is "The testimony of a witness deceased, or out of the jurisdiction, or unable to testify, given in a former action between the same parties, relating to the same matter." (Code Civ. Proc., § 1870, subd. 8.) In criminal proceedings the rule governing the testimony of witnesses other than defendant is contained in Penal Code, section 686, which provides that the testimony of a witness deceased, insane, out of the jurisdiction, or who cannot be discovered, given at a previous trial of the action, may be admitted. (See *People* v. *Bird,* 132 Cal. 261 [64 P. 259].) Petitioner, relying on section 1870, subdivision 8, of the Code of Civil Procedure, contends that the conditions imposed therein are not met. It has been repeatedly held, however, that disbarment proceedings are not governed by the rules of procedure governing civil or criminal litigation. (*Johnson* v. *State Bar,* 4 Cal.2d 744 [52 P.2d 928]; *Herron* v. *State Bar,* 212 Cal. 196 [298 P. 474]; *Matter of Danford,* 157 Cal. 425, 430 [108 P. 322]; *In re Vaughan,* 189 Cal. 491 [209 P. 353, 24 A.L.R. 858].) There is no legislative requirement, therefore, that the rules of evidence in the Code of Civil Procedure be applied in disbarment proceedings, although they are frequently invoked to insure a fair hearing. (See *In re Richardson,* 209 Cal. 492 [288 P. 669]; *In re Lacy* 234 Mo.App. 71 [112 S.W.2d 594]; *In re Durant,* 80 Conn. 140 [67 A. 497, 10 Ann.Cas. 539]; 5 Wigmore on Evidence (3d ed. 1940), § 1388, p. 103.) There is no reason for invoking them, however, if they are not necessary to serve that purpose.

Hearsay evidence is often excluded to insure that all evidence may be tested by cross-examination (*Englebretson* v. *Industrial etc. Com.,* 170 Cal. 793 [151 P. 421], see 5 Wigmore or Evidence (3d ed. 1940) § 1362.) On three successive trials petitioner had the opportunity to cross-examine the witnesses against him and the record shows that he fully exercised the right at the last trial so that there is little likelihood that any significant weakness in the testimony of the witnesses was overlooked. On essentially similar facts, in *In re Durant,* 80 Conn. 140 [67 A. 497, 10 Ann.Cas. 539], and *In re Lacy,* 234 Mo.App. 71 [112 S.W.2d 594], it was held that the record of a previous trial was admissible in a disbarment proceeding, and it was noted that when the court thus exercises its power to supervise its officers in a proceeding in which a jury has

no part, there is no need to adhere strictly to rules made primarily to govern jury trials.

In any event the requirements of section 1870, subdivision 8, of the Code of Civil Procedure, which petitioner contends is applicable to this proceeding, have been met. That section imposes three conditions upon the use of testimony given in a former action: the witnesses must be unavailable, the parties must be the same, and the subject matter of the proceedings must be the same. It was stipulated that The State Bar need not establish that the witnesses were unavailable. Petitioner was prosecuted in the name of the People of California, and the trial was conducted by attorneys representing the People. In the present proceeding the case against petitioner is presented by The State Bar, acting as the arm of this court and also representing the People of the State. In reality the parties are the same. Petitioner's contention that the subject matter is not the same is based on the fact that this proceeding is for disbarment, whereas the earlier case was a criminal prosecution. The Legislature, however, aware that a disbarment proceeding is different from any other type of action, could hardly have intended to preclude the use of the transcript of an earlier proceeding in a proceeding for disbarment. The State Bar seeks to prove the same facts that the public prosecutor sought to prove so that both proceedings actually do concern the same matter. (*Fredericks* v. *Judah,* 73 Cal. 604 [15 P. 305]; *McAlister* v. *Dungan,* 108 Cal.App. 185 [291 P. 419].) The requirement that parties and subject matter be the same is designed to make certain that the cross-examination in the first proceeding can serve as well in the second. (*Lyon* v. *Rhode Island Co.,* 38 R.I. 252 [94 A. 893, L.R.A. 1916A 983]; 5 Wigmore on Evidence (1940), § 1388, p. 95.) Since this purpose is fulfilled, the transcript was properly admitted. Moreover, petitioner was free to introduce additional evidence in his own behalf but did not avail himself of this right.

Petitioner contends that this evidence, even if admissible, does not establish that he offered to bribe the deputy district attorney. McNeil was under indictment for grand theft because of certain transactions in securities with a Mrs. Bovell. Petitioner had served as his attorney in similar situations until they had a disagreement over fees. Some time after the commencement of this prosecution against McNeil,

however, petitioner attempted to communicate with him, calling on McNeil's attorney in the litigation over the fee as well as on his attorney in the Bovell matter. McNeil, while at first unwilling to see him, finally telegraphed petitioner that he get in touch with him. On the 19th or 20th of August, 1937, petitioner called on McNeil, and in the following week several conferences took place between petitioner, McNeil, and petitioner's wife. After the first visit by petitioner, when McNeil allegedly offered to bribe Simpson, McNeil communicated with the district attorney's office. A dictaphone was placed in McNeil's home and listeners were posted in his basement.

McNeil was the principal witness against petitioner. He testified that petitioner said, when he first called on August 19th or 20th, that "Mrs. Werner had some good ideas and that he had some good ideas as to how to handle it in the District Attorney's office . . . and he said that Mrs. Werner was very well acquainted with Mr. Simpson, the Chief Deputy District Attorney there, and that for about $2,500 he could get Mr. Simpson to, as he said, kick this case out of the District Attorney's Office; in other words, he could square it up, but it would be necessary, naturally, to satisfy Mrs. Bovell. . . ." McNeil testified that on the same occasion petitioner stated "that he was satisfied that he could take care of it in the District Attorney's Office, by paying Mr. Simpson $2,500, and spreading some money around the police department. . . ." Petitioner and his wife called on McNeil the following Monday, and after a brief conversation petitioner went upstairs. McNeil testified that meanwhile he and Mrs. Werner discussed the arrangements to be made with the district attorney's office, and that "She said anything that was to be handled in the settlement of this matter in the District Attorney's Office, she would handle, herself; and if she didn't get to handle the money she would not have anything to do with it, because any time theretofore when they had any cases of this kind, if Pete got hold of the money she never got any of it, and that she could have this case dismissed in the District Attorney's Office by paying to Bill Simpson, the Chief Deputy District Attorney, $2,500." McNeil then testified that subsequently petitioner returned to the room and the conversation devolved upon possible arrangements with Mrs.

Bovell. Thereafter petitioner went out to a drugstore, and during his absence discussion of the arrangements with the district attorney's office was resumed, Mrs. Werner again insisting that she handle the money and direct the arrangements. On the following Thursday when the three met again there was a dispute between petitioner and McNeil as to the funds required for settling the case. Petitioner testified that ". . . he [McNeil] said, 'I will put up $10,000 to clear up your situation, Bergman and Mrs. Bovell, and give up the equity in the Crenshaw house and the furniture and these two houses in Culver City as soon as you can come and tell me that the District Attorney will dismiss my case . . .'" Petitioner replied, "You want me to settle this case for you on jawbone," but "It can't be done." According to McNeil it was then arranged that Mrs. Werner visit McNeil's house alone, but there is some dispute as to petitioner's knowledge of this arrangement. In any event, on Friday afternoon Mrs. Werner called and indicated that arrangements with Simpson had been completed, and again warned that she must handle the cash and the arrangements with the district attorney's office. On Friday evening petitioner and Mrs. Werner returned to McNeil's house. After petitioner was told that the cash for all the arrangements would be turned over Saturday, McNeil turned over to Mrs. Werner, while petitioner was out, an envelope supposedly containing the cash. Actually it contained some paper and one dollar bills. Petitioner and Mrs. Werner were arrested as they left the house.

The testimony of McNeil thus describes an offer to bribe Simpson by petitioner, acting through Mrs. Werner who repeated the offer several times. The fraudulence of such an offer is revealed by Simpson's testimony that he did not know Mrs. Werner, although he had met her once, and that he was absent from Los Angeles at the time the offer was made. In any event, the making of such an offer, whether or not there was any intention to carry it out, is an act of moral turpitude.

McNeil's own testimony was impeached, for it was shown that he was hostile to petitioner, that he had been convicted of a felony, and that he had made various inconsistent statements as to the time and substance of some of the conversations described. His testimony, however, was corroborated by the employees of the district attorney who had been posted

in the cellar, Miss Ruthe Wood, a secretary who took notes of the conversations in shorthand, and Mr. Frank T. Allen, an investigator who took some longhand notes.

Miss Wood's notes record that at the Wednesday conference, while petitioner was absent, Mrs. Werner said, "I want you before we leave here to make Erwin promise that he will talk with me and we will agree with you on everything that is to be done, because what Pete will do—and I want you not to let him do is have any contact with the District Attorney's office . . . I wouldn't go up there. I see Mr. Simpson—very old friend." Werner insisted on having control of the funds, saying, "I want you to pay me the money that is a part of this frame-up." Mr. Allen's notes likewise show that Mrs. Werner stated, "I will see Mr. Simpson; very old friend," and that she insisted on control of the funds.

Miss Wood's notes record further that on petitioner's return McNeil said to petitioner, "Helen and I had a talk while you were out . . . Helen is cocksure and you are and I am that this Bovell matter will be settled. This house and furniture plus $5,000. I don't care if you pay Bergman and the Police Department. As quick as we can all arrive at just what is necessary and the quicker I can hand it over—I don't want a receipt—it is a deal between three people . . . I am willing to go on that and I am willing to split another $5,000. There is no use to go ahead and hire a lawyer and go to trial and not know what the outcome is . . . I will let Helen and you work out the details. I believe it would be best that this thing can be worked out under her direction of what she has in mind . . . If Helen and you can come out at noon tomorrow and tell me that is all set and another $5,000 on the outside. . . ." Mrs. Werner: "I am not going to take you for one thing so far as my little end of it goes." McNeil: "You come out and tell me what you can do, it is worth something like that." Mrs. Werner: "I want to see one person and I can do that in the morning. They won't know what I want."

Miss Wood and Mr. Allen were away at the time of the Thursday conversation, but took notes again on Friday afternoon when Mrs. Werner appeared alone. Miss Wood's notes show that Mrs. Werner told McNeil that Simpson would instruct Mr. Arterberry, the deputy in charge of the McNeil case, to dismiss it; and that the following conversation oc-

curred: McNeil: "The house, furniture and a deed to those houses out there and $10,000." Mrs. Werner: "That is Bovshover (Mrs. Bovell's manager.)" McNeil: "The other to slide through D.A. office." Mrs. Werner: "This one usually charges $2,500."

Miss Wood testified that there was a conversation on Friday night between petitioner, McNeil, and Mrs. Werner as follows: McNeil: "About the other part. I am going to let Helen handle the money. I want you to be sure and be down here by the 12th. . . . This case is going to come up the 27th and I want it booted out of the District Attorney's office. I suggest this: Two fingers in the pie is a bad thing. If you are going to handle the District Attorney's end of it, if you want Pete to come in, he comes in, but not unless you want it. Is that right Pete?" Werner: "Yes." McNeil: "Pete handles the other end; you handle the District Attorney's office. Pete does only as you tell him and if it goes wrong, you are the one that gummed it up, Helen." Mrs. Werner: "I won't gum it up. I have never gotten in a mess up there on anything I have tried." The testimony of these witnesses shows that Mrs. Werner spoke of approaching Simpson and of a charge of $2,500 in that connection, and that petitioner was aware that his wife was to approach the office of the district attorney.

The fact that all references to Simpson occurred while petitioner was absent may be attributed to Mrs. Werner's desire to retain control of the funds, and to the likelihood that petitioner wished to remain in the background, having recently been subjected to criminal prosecution and to suspension proceedings by The State Bar. (See *Werner* v. *The State Bar,* 13 Cal.2d 666 [91 P.2d 881].) There was evidence that petitioner had previous experience with dictaphones, and some of the conversations were carried on in tones so low that Allen and Miss Wood were unable to hear them. It was Mrs. Werner who claimed to know Simpson, and was therefore the logical person to plan the approach to his office. The fact that Mrs. Werner proposed to bribe Simpson shortly after she arrived with petitioner to establish means to free McNeil, suggests that she had been led by petitioner to believe that such object was contemplated in the negotiations. There is additional corroboration of McNeil's testimony in the testimony of Mrs. Schapiro, McNeil's attorney in the litigation

over fees, that petitioner told her when trying to communicate with McNeil, ''You know I can have that case of the People against McNeil dismissed,'' and by the testimony of Mr. Newmire, McNeil's attorney in the Bovell matter, that petitioner stated to him that ''he was in a position to square the beef for Mac,'' and ''that it was not too late yet to fix the matter.''

It is contended by petitioner that the testimony of McNeil, Allen and Miss Wood, relative to the statements made by Mrs. Werner were hearsay as to petitioner. The hearsay rule, however, does not forbid the introduction of evidence that a statement has been made when the making of the statement is significant irrespective of the truth or falsity of its content. (*Smith* v. *Whittier*, 95 Cal. 279, 293 [30 P. 529]; see 6 Wigmore, *op. cit. supra*, § 1772, p. 191; see cases collected at 10 Cal.Jur., § 288, p. 1036.) Mrs. Werner's declarations that she would see Simpson were not offered as evidence that she intended to do so, but the making of the offer lends credibility to McNeil's testimony that petitioner made a similar offer.

*People* v. *Werner*, 16 Cal.2d 216 [105 P.2d 927], does not establish that Mrs. Werner's statements may not be considered in determining whether petitioner offered to bribe Simpson. Petitioner was there appealing from a conviction for attempted grand theft. The conviction was reversed, first, because McNeil's knowledge of the intention of petitioner and his wife, and his cooperation in turning over the envelope supposedly containing the funds made impossible either theft or an attempt at theft; secondly, because an attempt requires a direct effectual act in furtherance of the crime attempted, and although Mrs. Werner took the envelope she did so without petitioner's knowledge with the intention of keeping the proceeds from him, so that her act could not be attributed to him. The statement that the taking by Mrs. Werner was ''foreign to the alleged common plan'' cannot be regarded as denying the existence of such a plan.

Petitioner questions the accuracy of Miss Wood's notes, specifying various omissions, testimony that her symbols for ''I'' and ''he'' were much alike, and her dependence on the context of her notes and on her memory to determine their meaning. There is no showing, however, that the similarity

in symbols led to any substantial error, and it was not essential for Miss Wood to attempt to record everything.

Much of the testimony indicating petitioner's guilt was contradicted by petitioner and Mrs. Werner. It was reasonable, however, to attach greater credence to the testimony of McNeil, for it was corroborated by independent witnesses, than to that of petitioner and his wife. It is reasonable to suppose that the testimony of the latter would be influenced by the fact that they were charged with a crime of which they had already been found guilty. (*Caldwell* v. *Weiner*, 203 Cal. 543 [264 P. 1110]; *Davis* v. *Judson*, 159 Cal. 121, 128 [113 P. 147]; *Blanc* v. *Conner*, 167 Cal. 719, 723 [141 P. 217].)

The evidence shows unquestionably that petitioner was trying to make some arrangement for the dismissal of the charge against McNeil. Petitioner contends, however, that the evidence shows that the arrangement contemplated was restitution to Mrs. Bovell and a demonstration to Mr. Arterberry, the Deputy District Attorney in charge of the Bovell matter, of the weakness of the prosecution's case. It appears from Miss Wood's notes and from testimony of other witnesses that there was much conversation on the possibility of satisfying Mrs. Bovell and of convincing her that she overstated the case against McNeil, so that she would lose her effectiveness as principal witness for Arterberry. Thus Miss Wood's notes show that petitioner said, "I think we can put a story in her mind to the effect that there is nothing criminal about this; that Mr. Bovshover got her to say certain things that weren't true." The concern of petitioner and Mrs. Werner over Mrs. Bovell's attitude and the presentation of a strong case to Arterberry is not inconsistent with the evidence that they proposed to bribe Simpson. The reason given for bribing Simpson was that Arterberry was subject to his authority. Miss Wood's notes record that when Mrs. Werner was asked by McNeil, "Do you think he [Simpson] has control of Arterberry?" she replied, "Completely." Simpson, however, could hardly direct Arterberry to dismiss the prosecution without giving some reason; otherwise, not only Arterberry but Mrs. Bovell and her attorney, Mr. Bergman, would question the dismissal. An adjustment with Mrs. Bovell and an explanation to Arterberry for the dismissal of the prosecution would be natural if Simpson were to be bribed.

Petitioner contends also that Mrs. Werner was not going to bribe Simpson, but was going to hire another attorney to present the case to the district attorney's office; that this plan was implicit in her reference, made in petitioner's presence, to seeing a certain person; and that this plan accounts for the $2,500 of the $10,000 that was to be given Mrs. Werner, otherwise unaccounted for except for the testimony that it was to be used for a bribe. To support this argument, the attorney who defended Mrs. Werner on the criminal trial, and who now represents petitioner, testified that he was to be the attorney to present the case to the district attorney's office. This evidence was brought forward for the first time on the third trial and the conflict between it and the testimony of McNeil, Miss Wood, and Allen was resolved against petitioner by the local committee and the Board of Governors.

It is well established that the findings of The State Bar must be given great weight. (*Light* v. *State Bar,* 14 Cal. 2d 328 [94 P.2d 35]; *Furman* v. *State Bar,* 12 Cal.2d 212 [83 P.2d 12]; *Hizar* v. *State Bar,* 20 Cal.2d 223 [124 P.2d 812]; *Utz* v. *State Bar,* 21 Cal.2d 100, 104 [130 P.2d 377]; *Petersen* v. *State Bar,* 21 Cal.2d 866, 870 [136 P.2d 561].) The burden is on petitioner to show that the finding is clearly erroneous or unsupported in the record. (*Hizar* v. *State Bar, supra,* at 227; *Petersen* v. *State Bar, supra,* at 870; *Moura* v. *State Bar,* 18 Cal.2d 31 [112 P.2d 629]; *Kennedy* v. *State Bar,* 13 Cal.2d 236, 240 [88 P.2d 920].) Petitioner has not sustained this burden.

Petitioner contends that the finding of the Board of Governors is not within the issues raised by the notice. The notice stated that petitioner proposed to pay a sum of money to William Simpson for the purpose of bribing him in connection with the case of *People* v. *McNeil,* and that petitioner attempted to defraud McNeil by seeking to obtain from him a sum of money on the false representation that it would be used to bribe Simpson. The local committee found that petitioner made such an offer, and that it was intended as a means of defrauding McNeil. The finding of the Board of Governors was less explicit, declaring that petitioner entered into a plan with his wife to obtain $10,000 from William McNeil, and "represented to said McNeil that a part of said amount would

be utilized for the purpose of illegally arranging for the dismissal of a criminal charge pending against McNeil. . . .'' While this finding does not follow the language of the notice, it is amply supported by the evidence, and shows a plan to defraud and an offer to bribe a public officer. The board also found ''that as a part of said plan the respondent, with his wife, sought to obtain $10,000 from William McNeil with intent to commit grand theft of a portion of said amount.''

■■■ Whether petitioner intended to use the money to bribe a public officer or whether he intended to secure it for himself, he committed acts involving moral turpitude that constitute a cause for disbarment.

It·is therefore ordered that the petitioner be disbarred from the practice of law in California and that his name be struck from the roll of attorneys, this order to become effective thirty days after it is filed.

Gibson, C. J., Curtis, J., and Edmonds, J., concurred.

SHENK, J., Concurring and Dissenting.—I concur in the order of disbarment on the ground that the transcript of the testimony of witnesses taken on the trial of the petitioner for the criminal offense was admissible in evidence in the disbarment proceeding pursuant to the stipulation entered into by the petitioner, and that the evidence supports the conclusion that disbarment should follow. However, I dissent from the determination that, aside from the stipulation, and assuming unavailability of the witnesses, the transcript of the testimony taken at the trial of the petitioner on a felony charge as to which there was no final judgment of conviction, may be introduced in a disbarment proceeding against him to prove the commission of acts of moral turpitude. In a case of conviction, the testimony would be unnecessary as the fact of conviction is ground for disbarment. In my opinion this court in the absence of a stipulation, should not approve the introduction in evidence in a disbarment proceeding of the transcribed testimony of witnesses taken in the trial of an attorney on a charge of which he was not finally convicted, to prove acts of moral turpitude, much less in a case, such as this, where the determination of the question is not a necessary ground for disbarment.

Furthermore, I am in disagreement with the statement in

the majority opinion that the requirements of section 1870, subdivision 8 of the Code of Civil Procedure have been met, in that the testimony was "given in a former action between the same parties, relating to the same matter." The majority do not come to the conclusion that the parties and subject matter are the same. (*Cf. United States* v. *Aluminum Co. of Am.,* [D.C.-N.Y.] 1 F.R.D. 48.) The opinion avoids the necessity for such a conclusion by stating in essence that the effect is the same; that in disbarment proceedings the law does not require a strict adherence to the rules of procedure governing civil and criminal cases, and that there is no reason for invoking such rules unless they are necessary to insure a fair hearing. This court has recognized that in hearings in disbarment proceedings there is a measure of freedom from the rules of procedure applicable to the courts. But this court has also adhered to the requirement that an attorney may not be stripped of his privileges except on competent and legal evidence. In *In re Richardson,* 209 Cal. 492 [288 P. 669], it was pointed out that it is not so much a matter of procedural rules, as it is the kind of evidence that is necessary and sufficient to deprive an attorney of his right to practice. In that decision, in holding that hearsay evidence is not competent for the purpose, it was said at page 499: "Legal evidence alone should be required to deprive a duly admitted attorney of the vitally important and valuable right to practice his profession, and to impose upon him the stigma of disbarment. The court can be asked in such review only to consider the sufficiency of legal evidence. We are of the view, therefore, that only legal evidence, as that term is understood among lawyers, should receive the consideration of the Board of Governors and committees of The State Bar in the exercise of the disciplinary features of the Bar Act." That view was followed with reliance on the Richardson case in *Masters* v. *Board of Dental Examiners,* 15 Cal.App.2d 506 [59 P.2d 827].

The well understood test in this state as to the admissibility of the testimony of witnesses taken at a previous trial, where there has been opportunity for cross-examination, is not the court's opinion as to the adequacy of the cross-examination and fairness in the particular case, but is the identity of subject matter and parties. In *Neblett* v. *State Bar,* 17 Cal.2d

77 [109 P.2d 340], it was noted that the differences in the nature of the proceedings, in the parties, and in the subject matter inherent in a previous trial and in a disbarment proceeding, might greatly affect the interests and therefore the results produced by cross-examination of the same witnesses.

The cases supporting the majority and minority rules governing the admissibility of testimony taken in a previous trial when the witnesses are unavailable, as an exception to the rule excluding hearsay, are collected in 21 Ann.Cas. page 179, et seq. The majority rule, prevailing in England, Canada, and in our federal and state courts, requires essential identity of the matter in issue and of the parties, the latter comprehending privies in blood, in law or in estate. The statement in the text of the minority rule permitting opportunity for cross-examination (instead of requiring identity of parties and subject matter), as the test of admissibility—the rule applied by the decision in the present case—is supported by the citation of a case from each of two states, Connecticut and Nevada. The decision adds one from the State of Missouri. There may be others, but it seems to me that the majority rule, which has been adopted in this state by statute, should not be disregarded in any determination of the question.

Carter, J., concurred.