[S. F. Nos. 16968, 17017. In Bank. Nov. 1, 1944.]

JOHN V. COPREN, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

John V. Copren, in pro. per., for Petitioner.

Erwin C. Easton and Jerold E. Weil for Respondent.

THE COURT.—Petitioner seeks a review by this court of two disciplinary proceedings instituted against him upon separate charges of misconduct as an attorney at law. The charges arose out of petitioner's representation of his clients Mrs. Rosella Connelly (case No. S. F. 16968) and Mrs. Lillie Routt (case No. 17017). The show cause orders recited that petitioner had violated his oath as an attorney and had committed acts involving moral turpitude, and that he had violated rule 9 of the State Bar Rules. It was found by the local committee that in both matters the alleged misconduct had been committed. The Board of Governors adopted the findings of the local committee, and recommends a suspension of three years and three months, respectively, in these matters. The two proceedings have been consolidated for the purposes of this opinion.

### THE CONNELLY MATTER (S. F. 16968)

Eugene Connelly died in October, 1937, leaving his widow and a son and daughter. He bequeathed all of his estate to his widow. The estate consisted only of an automobile, but three pieces of real property were in Mrs. Connelly's name at the time of her husband's death. Petitioner had

known Connelly and had transacted business with him for a long time before his death. According to the findings petitioner "sent for" Mrs. Connelly after the death of Connelly and suggested to her that it would be advisable to bring an action to quiet title to the real property. At that time Mrs. Connelly was sixty-three years of age and was inexperienced in business matters. She agreed to follow petitioner's suggestions, and it was arranged that he should represent her in such action. It was understood between them that petitioner would make no charge for his services because of his previous association with Connelly. Thereafter petitioner discussed the matter of bringing the action with William Breen, another member of the bar who had also been a friend of Connelly, and was told that in Breen's opinion no action would be necessary to establish Mrs. Connelly's title to the real property standing in her name. Petitioner then stated that the title company had informed him that it would be advisable to have an administratrix with the will annexed appointed and to bring a suit to quiet title. Breen again disagreed with that view but stated that nevertheless he would assist in the action in any way he could because of his friendship with Connelly. Breen also stated that he would not charge a fee for his services but would expect to be reimbursed for costs, although it does not appear from the record whether this statement was made at the time he agreed to assist in the matter, or later. Breen assisted in the matter by representing the daughter, who was appointed administratrix with the will annexed. The local committee found that thereafter, on November 15, 1937, petitioner obtained from Mrs. Connelly the sum of $250 for the purpose of paying a fee to Breen for his services in connection with the proceedings, on the understanding that if Breen's fee was less than this amount the balance would be repaid to Mrs. Connelly. Petitioner instituted the quiet title action against the administratrix with the will annexed, and on December 22, 1937, a decree was entered quieting title in plaintiff. Prior to this date petitioner had paid Breen $20 on account of expenses, but no sum had been paid to him as a fee. It was found that no part of the $250 was spent for any purpose connected with the Connelly litigation, but that petitioner commingled the balance of $230 with his own funds and appropriated it to his own use and benefit, without the knowledge of Mrs. Connelly.

The committee also found that on the day the decree was

signed petitioner secured an additional sum of $50 from Mrs. Connelly on the representation that it was to be used for expenses, although no other expenses were contemplated at that time. It was found that this sum also was not used for the purpose for which it was paid petitioner but was appropriated by him to his own use without Mrs. Connelly's knowledge or consent. On March 10, 1938, Mrs. Connelly also paid petitioner the sum of $100 for the express purpose of paying certain income taxes on her behalf. Of this sum only $54.65 was expended by petitioner for payment of the income taxes, and the balance was not returned to Mrs. Connelly except at a later time, and under compulsion.

The findings also recite that on four different occasions during March, April and May, 1938, petitioner borrowed from Mrs. Connelly sums of money aggregating $500, for which he gave her postdated checks. On August 11, 1938, he borrowed an additional $500, at which time he gave her a promissory note in the sum of $1,000 to cover the full amount of these loans. Thereafter he also borrowed $215 from Mrs. Connelly and gave her a postdated check therefor, but this sum was eventually repaid. It was found that on the occasions on which petitioner borrowed the sums referred to, he represented to Mrs. Connelly that he would have the funds to repay her promptly, and that he thereby took advantage of her lack of business experience and of the confidence she reposed in him as her attorney and as the friend of her deceased husband.

It was further found that in October, 1939, at which time no part of the $1,000 had been paid, Mrs. Connelly became disturbed because of the nonpayment and consulted Breen. She then learned for the first time that he had not been paid the $250 or any sum as a fee in connection with the probate proceeding and that petitioner had paid him only $20 for costs. Thereafter Mrs. Connelly employed other counsel to represent her in collecting the money owed her by petitioner. He then furnished an accounting, claiming certain expenditures on behalf of Mrs. Connelly and paid her $300, which was accepted as full payment of the amounts owing her from the advances made to him, except for the sums represented by the promissory note. In an action on the note petitioner confessed judgment in the sum of $1,140. No part of the judgment has been paid.

The foregoing findings find ample support in the record. When petitioner was questioned at the hearings as to the circumstances surrounding the payment to him of the $250 in November, 1937, he testified, in part, that Mrs. Connelly "was going away and wanted to leave the money with me and pay the money to me, and I told her I would accept the money, but I would rebate it to her, that is any balance or any amount in excess of what Mr. Breen might charge for his work in the matter . . . also she gave it to me as a loan and for which I gave her a receipt and told her I would pay it back to her." The receipt recites that it was for $250 "on account of E. P. Connelly, deceased, matters." At another time petitioner again stated that the money was given to him to do with as he wished, although it was his intention to ascertain later on what Breen's fee would be and personally remit the amount thereof to him. In his application to this court petitioner stresses the contention that the $250 was a loan. He directs attention to a statement by Mrs. Connelly, while testifying, in which she referred to the $250 as "the one he [petitioner] borrowed for Mr. Breen." The questioning of Mrs. Connelly immediately preceding the making of this statement indicates, however, that she was confused when she used the word "borrow" with reference to the $250, having only a moment before spoken of the sum of $215 which petitioner had "borrowed" from her at another time. In any event, it seems apparent that Mrs. Connelly, in referring to the $250, did not use the word "borrow" in the sense of a loan to petitioner. This is borne out by the several statements made by her both before and after the one referred to, in which she gave positive testimony that the sum of $250 was given to petitioner for the specific purpose of paying a fee to Breen, and with the understanding that the balance, if any, was to be returned to her. The attorney who was later employed by Mrs. Connelly to recover the sums owing her from petitioner not only testified that Mrs. Connelly told him the $250 was given to petitioner to cover Breen's fee but that petitioner also made this statement to him.

Breen was called as a witness and questioned as to the occasion on which he informed petitioner that he would charge no fee. He replied, "It seems to me before the litigation was started [petitioner] mentioned getting a fee for me, but I am not positive it was at that time . . . [however] at some time or other he said he would see I would get a fee."

Petitioner testified that he believed the $20 was paid to Breen on November 15, 1937, the day the $250 was given him by Mrs. Connelly. He was then asked whether he said anything to Breen at that time about his fee, to which he replied, "Not a thing. . . . No." At another time he stated it was not until the fall of 1938 that he discussed the matter of a fee with Breen and was informed he would accept none. Notwithstanding the evidence, including portions of his own testimony, that pointed to the fact that Breen was to be paid a fee out of the $250, petitioner advances no valid reason why he failed to mention the matter of attorneys' fees to Breen at the time he paid the $20. It was his duty to discuss this matter with Breen as soon as practicable after receipt of the fund, yet according to his own testimony he waited a year before doing so. Petitioner was guilty not only of failing to carry out the terms of his trust with regard to this money but of failing to return the balance of $230 to his client after he was informed that Breen would charge no fee, which indicates an intent to appropriate this fund to his own use. Indeed, he concedes that he utilized the money for his own purposes, on the unsupported claim, however, that the money was lent to him.

The charge of misappropriation of the $50, given petitioner "for additional expenses" at the time the decree was rendered, is also supported by the record. As noted, he requested this sum at a time when he admittedly had in his possession at least $230 of the $250 given him the previous month. Petitioner makes the same inconsistent claim with regard to the $50 that he made concerning the $250: that although he was to pay further expenses out of it, it was to be considered as a loan to him to be used for his own purposes and later repaid to Mrs. Connelly. The record does not support the contention that the $50 was a loan to petitioner. Petitioner also gave Mrs. Connelly a receipt for this amount in which he stated that it was "on account of expenses case Rosella Connelly v. Loretta Cutherell, Administratrix" [referring to the quiet title action]. This receipt, like the one given for the $250, discloses on its face that the money was given to petitioner in trust for uses in connection with the legal matters on behalf of Mrs. Connelly, and not as a loan to petitioner. When questioned at the hearings as to what other expenditures could be anticipated at the time the decree was entered, petitioner

stated that they might be incurred in connection with a title search if Mrs. Connelly should sell any of he property. The committee found, however, and the record discloses, that at the time the $50 was paid to petitioner no further expenses were contemplated. Normally, in a quiet title action no additional expenses are to be expected by the prevailing party after the decree is entered. Moreover, the record here discloses no evidence that Mrs. Connelly contemplated selling any of the property or that she ever suggested a sale thereof to petitioner.

Petitioner's retention of the balance of the $100 given him for the payment of income taxes after paying out only $54.65 for such purpose, was likewise a breach of trust. Although he does not contend that any part of this sum was given him for a purpose other than to pay the taxes, he admits having spent only a little more than half this sum for such purpose. He testified that he placed the balance of the money in a safe deposit box where it was kept until the accounting. Assuming, therefore, that there was no actual misappropriation of this money, petitioner advances no satisfactory reason for failing to return it to his client. The record indicates that, because of such failure and her inability to get in touch with petitioner, Mrs. Connelly was forced to expend other money in payment of additional income taxes. Petitioner retained the balance of this fund from March, 1938, until some time in 1940, when he was forced to render an accounting to Mrs. Connelly of this and the other money before referred to.

Under all the circumstances here disclosed petitioner's conduct in repeatedly borrowing sums of money from his client cannot be condoned. Knowing of her inexperience in business matters and without offering any security therefor, petitioner borrowed from Mrs. Connelly a sum that would be considered sizeable to one in her circumstances. She testified that at the time of each loan petitioner represented that his need for the money was urgent and that he would pay it back in a very short time. As to the loan of $500 in August, 1938, Mrs. Connelly stated that petitioner promised to pay her 7 per cent interest on the $1,000 note and assured her that "in less than six months" she would "have all that money back"; and that she made the loan under the belief that she was "dealing with an honest man." At the time she loaned petitioner the $215 she stated that he came to her home and told her that he "had to have it right away, for three days"; that she told him she "wasn't a rich woman and could not lend him money,"

although she consented to do so when he gave her a post-dated check and repeated his assurance that the loan would be for a few days only. She stated that she held this check for a long time thereafter because she "hated to make trouble for him," but that when she found that she could not reach him by telephone and that he did not answer her letters she wrote him again and stated that she would cash the check if she did not hear from him; and that shortly thereafter he paid her the $215. Mrs. Connelly stated that she also encountered the same difficulty in getting in touch with petitioner when the $1,000 note was not paid after the lapse of considerable time. She testified that when she did eventually see him at his office he treated her in a rude and insulting manner. Petitioner's frequent references in his application to this court to the fact that he charged Mrs. Connelly no fee for his services does not militate against the gravity of his conduct. The sums he received from her in trust and those he borrowed and which are still unpaid are greatly in excess of any reasonable fee that he might have earned had he charged for his services.

## The Routt Matter (S. F. No. 17017)

On May 6, 1943, one Routt was convicted of a criminal offense in the United States District Court. On May 12th his wife consulted petitioner as to the advisability of seeking a new trial or of taking an appeal from the judgment. It was agreed between them that petitioner would receive the sum of $50 for making an investigation of the matter and advising Mrs. Routt in the premises. On the following day Mrs. Routt gave petitioner the $50. At the time of these events an appeal had already been taken by the attorney who had represented Routt at the trial. The local committee found, however, that this fact was unknown to Mrs. Routt when she consulted petitioner, and that she did not become aware of it until the institution of these hearings before The State Bar. On the date petitioner received the $50 he examined the file in the federal court action and learned that a notice of appeal had already been filed. Thereafter, according to the findings, petitioner failed to return the $50 to Mrs. Routt and neglected to communicate with her further in connection with the matter.

Petitioner testified that after he had examined the federal court records and found that an appeal had already been taken he personally typed a letter to Mrs. Routt in which he

informed her of that fact and advised her that he would be away for about two weeks but could see her in his office on May 27th. He submitted a purported carbon copy of this letter at the time of these hearings. Petitioner also testified that beginning on about May 22d he was without a secretary and thereafter was in Nevada much of the time, and that in his absence no one was in his office to receive calls from his clients. He stated further that about May 27th one of Mrs. Routt's friends called his office and told him that she had been ill; that he told this person to have Mrs. Routt come in when she recovered from her illness, but that he heard nothing from her until these proceedings were instituted.

Mrs. Routt denied ever having received the letter that petitioner claimed he sent her, and under the evidence hereafter referred to the committee properly resolved this conflict in her favor. Her principal complaint was that petitioner did not "let her know what happened, so she could get someone else" to represent her in the matter about which she had consulted him. She maintained that the first time she heard of the fact that an appeal had already been taken at the time she consulted petitioner was when he so testified at these hearings. She further stated that in the following week after she had paid petitioner the $50 she telephoned his office on several occasions and was informed by his secretary that he was out of town and would not be back until the week-end; that about this time she became ill and was confined to her home for about six weeks. She stated that during this period, however, she had someone call petitioner's office every day, and that except for the one occasion when petitioner told her friend to have her come in when she recovered from her illness no one ever answered his telephone. She further stated that when she became well again she telephoned petitioner's office several different times to make an appointment with him but was never able to get in touch with him and that she then presented the matter to The State Bar.

The basic finding in this matter is that petitioner failed to do what he had agreed to do and for which he had been paid the fee of $50; that is, to conduct an investigation in the federal court as to the status of the criminal case against Routt and thereafter "transmit to Mrs. Routt the report and advice for which he had been employed by her." Petitioner maintains that this finding was without factual support. The record shows, however, that petitioner gave Mrs. Routt no

advice nor did he ever return any portion of the money to her although he testified that he "charged her $50.00 for making the examination and giving advice as to what he thought of the prospects of a motion for a new trial or appeal." His testimony contains inconsistencies and conflicts." He repeatedly stated that "when he had made the examination of the record" he felt that his duty was performed, except to give her advice "when she came in." Again he stated that "The only purpose [for which] he wanted to see her was to adjust the fee." Petitioner's frequent references to an intention "to adjust the fee" and to the fact that he intended "to give the advice" when Mrs. Routt came in to see him appear to be only belated attempts to exculpate himself from the charges of misconduct in this matter. Had he been sincere in his professed desire to make an adjustment of the fee he could have done so at any time by sending her such part of the fee he had accepted as he felt was proper, or by arranging for her to receive it at his office. The same is true with regard to the advice that he claimed he intended to give her when she came to his office. Although it is true that on the one occasion he told her friend to have her come in to his office when she recovered from her illness, his voluntary absences from his office thereafter to attend to other legal matters in the State of Nevada, as he testified, rendered her efforts to do so futile. Following the payment to him of the $50, and up to the time these proceedings were instituted petitioner, by his own computation of the time, was in his office only for a day or so on a few infrequent occasions; and even at such times he failed to arrange to see Mrs. Routt in connection with the matter she had placed in his hands.

Petitioner contends he was entitled to have the conflicts in the evidence resolved in his favor. When questioned as to the circumstances surrounding his typing of the purported letter of May 13th, petitioner stated that when he returned to his office after examining the files in the federal court action he typed the letter; that his stenographer was out to lunch when he reached his office; he also stated that he could not recall what time he arrived at his office but that it was "some time in the middle of the afternoon"; he then stated that his stenographer frequently left his office in the middle of the afternoon to go home—and sometimes she left his office as early as 2:30 or 3:00 o'clock. In the light of all the circum-

stances, including the inconsistencies in petitioner's testimony and the further fact, pointed out by respondent, that certain physical aspects of the copy of the letter were such as to raise a serious doubt of its authenticity, it cannot be said that the conflict was improperly resolved against petitioner.

Petitioner has not sustained the burden of showing that the findings in the two disciplinary matters just reviewed were unsupported (*Werner* v. *State Bar*, 24 Cal.2d 611, 623 [150 P.2d 892] ; *Hizar* v. *State Bar*, 20 Cal.2d 223 [124 P.2d 812] ; *Petersen* v. *State Bar*, 21 Cal.2d 866, 870 [136 P.2d 561]).

In imposing the discipline recommended by the Board of Governors we have not considered any previous complaint made against petitioner to The State Bar where discipline was not imposed. (*Herron* v. *State Bar*, 24 Cal.2d 53 [147 P.2d 543].)

It is hereby ordered that effective thirty days from the filing of this decision petitioner be suspended from the practice of the law in this state for the period of three years and three months.

CARTER, J., Concurring and Dissenting.—I concur in that portion of the majority opinion which holds that petitioner was guilty of unprofessional conduct in retaining the sum of $230 which Mrs. Connelly had advanced to him for the purpose of paying an attorney's fee to Mr. Breen after the latter had advised petitioner he would charge no fee for the service which he rendered Mrs. Connelly. The same is true with respect to the sum of $50 which petitioner obtained from Mrs. Connelly for alleged expenses in the quiet title action which he handled for her, and also with respect to his failure to remit to her the balance of the $100 which he received from her to pay income tax on her behalf. In my opinion the record supports the findings of the local administrative committee that petitioner was guilty of unprofessional conduct in retaining the above mentioned amounts after he knew that he was not required to disburse the same on behalf of Mrs. Connelly and she was entitled to have said sums returned to her promptly.

I do not agree with that portion of the majority opinion which holds that petitioner was guilty of unprofessional conduct in borrowing money from Mrs. Connelly. I know of no law or rule of professional conduct which is designed to prohibit an attorney from borrowing money from his client. It is

not claimed that petitioner made any misrepresentations to Mrs. Connelly at the time any of the loans were obtained from her. It is true that he advised her that he would be able to pay these loans promptly, but it must be conceded that this is not the type of representation which can be said to amount to fraud or which can be made the basis for a charge of unprofessional conduct. When Mrs. Connelly made the loans in question to petitioner she expected him to repay her, and no doubt petitioner's intentions in this regard were the very best. This is the usual situation in most cases between lender and borrower, and so far as the record discloses in this case the situation was no different from the ordinary case of lender and borrower where for some reason, not within the contemplation of the parties, the loan is not repaid. Obviously, if petitioner had repaid the loans when they became due, it could not be said that he was guilty of misconduct in obtaining the loans in the first instance. The question then arises as to whether or not the failure to meet a future obligation in the nature of a loan is such a violation of his duty to his client as to amount to moral turpitude. I do not believe that such conduct comes within the purview of any definition of moral turpitude that has yet been called to my attention. Many an honest person has not been able to meet his obligations when they became due, and I doubt if even the strictest disciplinarians would venture the suggestion that Abraham Lincoln and Ulysses S. Grant were guilty of moral turpitude because they were unable to meet their obligations when they became due.

I do not agree with that portion of the majority opinion which holds that petitioner was guilty of unprofessional conduct in connection with his employment by Mrs. Routt. All that can be said against petitioner's conduct in this matter is that he failed to communicate with Mrs. Routt after he ascertained that an appeal had been taken by the attorney who represented her husband in the criminal case regarding which she consulted petitioner. At most, it can only be said that petitioner may have been guilty of negligence in not communicating with Mrs. Routt. In my opinion there is no basis in either fact or law for holding that petitioner violated any rule of professional conduct or was guilty of moral turpitude in his conduct in connection with this matter, as mere negligence cannot be relied upon as a basis for administering discipline to a member of the bar. I have heretofore stated my

position on this proposition and I adhere to the views expressed in my dissenting opinions in the cases of *Trusty* v. *State Bar,* 16 Cal.2d 550, 554 [107 P.2d 10], and *In re McKenna,* 16 Cal.2d 610, 612 [107 P.2d 258].

While I agree that the record discloses that the petitioner was guilty of unprofessional conduct in failing to promptly return to Mrs. Connelly the unexpended portion of the amounts which she advanced to him to cover attorney's fees, expenses and taxes, I am not disposed to concur in the conclusion that he should be suspended from practice for the period of three years and three months. The sums withheld were repaid to her long before this proceeding was commenced, and the only amounts she has not received are those covered by the loans which have been reduced to judgment.

The local administrative committee recommended that petitioner be suspended for the period of six months for his conduct in connection with the Connelly matter, and in my opinion this is ample punishment for all of the misconduct perpetrated by him as disclosed by the record in this case.

Petitioner's application for a rehearing was denied November 30, 1944. Carter, J., voted for a rehearing.